**In re INTERNATIONAL SYSTEMS AND CONTROLS CORPORATION SECURITIES LITIGATION.**

**No. MDL–440.**

United States District Court,
S. D. Texas,
Houston Division.

Sept. 25, 1981.

Robert A. Stull, Abraham I. Markowitz, New York City, I. Walton Bader, White Plains, N. Y., Lester L. Levy, New York City, Martha Evans, Houston, Tex., Alan Epstein, New York City, for plaintiff.

Travis C. Broesche, Houston, Tex., Carl D. Liggio, New York City, Thomas C. Green, David M. Webster, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

NORMAN W. BLACK, District Judge.

Pending before the Court is Plaintiff Koenig's motion to compel Defendant Arthur Young ("AY") to produce its "Special Review" binders containing the material resulting from AY's employment by ISC's[1] Special Audit Committee[2] to assist that committee in the investigation of questionable foreign payments. By letter to the Court dated June 10, 1981, Plaintiff Harry Lewis joined in this motion. The production of these binders has been vigorously resisted by Defendant ISC, who has raised both the attorney-client privilege and the work product doctrine.

## BACKGROUND

In deciding close questions of privilege, a chronology of the pertinent events must be kept in mind.

1. On March 3, 1976, the Securities and Exchange Commission sent a letter to ISC requesting information from ISC and its subsidiaries regarding any falsely described funds and assets, fraudulent accounting entries, improper payments to foreign government personnel and political contributions during the period from January 1, 1970, to that date.

2. On May 24, 1976, the ISC Board of Directors appointed a Special Audit Committee composed of two outside directors to review ISC operations during the relevant period. The Board resolution authorized the committee to retain outside legal counsel and an accounting firm to assist in this investigation. The Kansas City law firm of Watson, Ess, Marshall & Enggass ("Watson, Ess") was retained on June 11, 1976. By letter dated June 15, 1976, Arthur Young confirmed their own special engagement. Arthur Young was also the independent auditor for ISC from approximately 1973 through the fiscal year 1976 audit.

The Special Audit was seemingly undertaken in an effort to comply with the requirements of the SEC's Voluntary Disclosure Program.

---

1. The term "ISC" as used in this order includes the parent company, International Systems & Control Corporation, and its subsidiaries.

2. ISC referred to their internal investigation as a "Special Audit", AY designated this engagement by ISC as a "Special Review."

3. The Special Audit was conducted throughout the remainder of 1976 and 1977. It appears that during 1976, AY and Watson, Ess worked side by side, each examining ISC and subsidiaries' records and accounts, conducting interviews, and making interim reports to ISC's Special Audit Committee. Along the way, and certainly by the Spring of 1977, Arthur Young's role in the investigation was redefined to provide assistance to Watson, Ess. By letter dated May 23, 1977, AY acknowledged this new role and agreed to make their special review workpapers available to both ISC and Watson, Ess, and to submit a company-by-company status report of their special review work.

A draft report on the Special Audit was prepared in late 1977. There is no "final" AY report, nor a "final" Special Audit report. The entire investigation spanned at least eighteen months and cost 1.5 million dollars. (Surrey letter of March 30, 1978).

4. On February 17, 1978, ISC was served with an SEC subpoena. The next few months were filled with attempts to negotiate a consent agreement between ISC and the SEC. Various letters reveal that there is serious doubt as to whether ISC was ever accepted as a participant in the Voluntary Disclosure Program. Throughout these negotiations, counsel for ISC insisted there was no intent by ISC to waive the attorney-client privilege.

5. On April 27, 1978, a shareholder's derivative suit was filed in the Southern District of Texas, *Lewis v. Kenneally, et al.*, No. H–78–777, naming the individual members of the Board of Directors and ISC as defendants.

6. On July 15, 1978, the SEC filed a complaint against ISC in the District of Columbia. A consent decree was eventually entered in that case.

7. On January 29, 1979, Benjamin Koenig filed suit against ISC in the Southern District of New York, alleging shareholder fraud and violation of the federal securities laws, *Koenig v. Kenneally, et al.*, now No. H–81–124.

These two suits were subsequently consolidated with three others for pretrial purposes by the Multidistrict Panel into the case at bar, MDL–440.

Plaintiffs Koenig and Lewis have moved to compel production of the AY Special Review workpapers. There are approximately 16,000 pieces of paper involved, contained in several binders. These binders are in the actual possession of AY, to whom they belong. AY itself has asserted no work product immunity and is not opposed to producing the material. ISC insists that these workpapers constitute work product protected from production under Fed.R. Civ.P. 26(b)(3). Their contention is based on three premises: (a) Since Watson, Ess was in charge of the investigation, all of these files contribute attorney work product; and/or (b) the papers were all prepared by or for another party, or by or for the other party's representative, within the meaning of Rule 26(b)(3); and (c) all of the Special Review work was done in anticipation of litigation.

Plaintiffs maintain (a) that AY was not working under the direction of Watson, Ess and AY's work papers are therefore not attorney work product; but (b) that even if the AY files do constitute work product, Plaintiffs have demonstrated substantial need and undue hardship sufficient to overcome the work product immunity. They further assert that Defendants have waived their attorney-client privilege as to much of the material in AY's Special Review files in disclosures to the SEC and because it "impacted" on the ISC 1976 Annual Report prepared by AY as the independent auditor. Plaintiff Lewis further relies on *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).

Both sides have filed numerous briefs on this motion. A lengthy deposition was taken of Robert F. Teague, the AY partner in charge of the ISC Special Review. A hearing was held on July 8, 1981, with testimony by John F. Marvin, a partner with Watson, Ess, and oral argument by the attorneys for both sides. Counsel for ISC has submitted for *in camera* inspection an abstract of the 123 items in AY's Special Review binders,

constituting almost 2,000 pages, which he believes are immune from discovery. His list includes a description of the document as to sender, recipient, and contents, the date, and whether ISC is asserting the attorney-client privilege and/or work product protection as to each.

This Court has carefully considered the relevant pleadings, particularly the amended complaints in both *Koenig* and *Lewis*, the deposition of Mr. Teague, and the testimony of Mr. Marvin. The facts and allegations distilled therefrom have been examined in light of the cases cited by both sides. As is often the case, the "truth" of the matter seems to be somewhere between the positions so staunchly defended by the two adversaries. The Court finds that some of the documents listed by ISC are indeed protected by the attorney-client privilege, some by the work product doctrine, and many documents by neither.

## LAW

It is now accepted that a corporation may assert the attorney client privilege. See *Upjohn v. United States*, 449 U.S. 383, 101 S.Ct. 677, 683, 66 L.Ed.2d 584 (1981), citing *United States v. Louisville & Nashville R. Co.*, 236 U.S. 318, 336, 35 S.Ct. 363, 369, 59 L.Ed. 598 (1915); also, *Radiant Burners, Inc. v. American Gas Assoc.*, 320 F.2d 314 (7th Cir.), *cert. denied*, 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963). The privilege is the client's to assert, and applies both to communications from the lawyer to the client, as well as communications from the client to the lawyer. *Upjohn, supra.* When the client is a corporation, the privilege extends to those communications to or from the attorney by any employee if the communication concerned matters within the scope of the employee's corporate duties, the employee was aware he was being questioned in order that the corporation may obtain legal advice, and the communication was considered highly confidential when made and has been kept confidential by the company. 101 S.Ct. at 685.

The work product doctrine defined in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and codified in Fed.R.Civ.P. 26(b)(3) applies to documents and tangible things prepared in anticipation of litigation by or for another party, or by or for that other party's lawyer or other representative, as well as to an attorney's mental impressions, conclusions, opinions or legal theories. The rule provides that the work product immunity of documents and tangible things may be overcome by a showing of substantial need and undue hardship by the one seeking production. The latter category of work product, attorney's mental impressions and opinions, including notes of oral statements from witnesses, requires an even greater showing of necessity in order to compel production. The Supreme Court refused in *Upjohn* to decide exactly what showing, if any, would be sufficient. *Upjohn*, 101 S.Ct. at 688.

While there is no federal accountant client privilege, *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), see *U. S. v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981), certain material produced by the accountant either for the party directly or for the party's attorney, may be immune from discovery if done in anticipation of litigation. *U. S. v. Davis* at 1043, n.17.

Unlike the attorney client privilege, disclosure to a third party does not necessarily destroy work product immunity, since its primary purpose is not so much the protection of the confidentiality of the communication, but the integrity of the adversarial system. *Hickman v. Taylor, supra.*

While the work product doctrine is more frequently invoked by the attorney or other representative whose labors produced the material, courts have acknowledged that the client also has an interest in the material and may assert this immunity from production. *In re Grand Jury Proceedings*, 604 F.2d 798, 801 (3d Cir. 1979).

The corporation has the burden of proof, both as to the attorney client privilege and its work product claim. *Weinstein's Evidence* ¶ 503(b)[04] at 503–45.

### APPLICATION

In the process of applying these legal principles to the case at hand, the Court has examined the holdings in other cases involving internal investigations by corporations, especially those involving "sensitive payments," and compared their underlying facts to those present herein. Agreeing with the Second Circuit Court of Appeals that these accountant work papers "defy blanket categorization" (infra, 599 F.2d at 513), the Court has measured each of the 123 items against the following findings and conclusions.

■ First, the Court believes the better rule of law dictates that Watson, Ess be regarded as acting as an attorney in carrying out its part of the Special Audit. They were hired to investigate through the trained eyes of an attorney, just as AY was to review records through the eyes of experienced accountants. Therefore, ISC may properly invoke the attorney client privilege as to any confidential communications between ISC and Watson, Ess that are in the AY Special Review binders. *See Upjohn v. United States, supra; In re Grand Jury Subpoena*, 599 F.2d 504 (2d Cir. 1979).

This assertion of privilege is subject to the shareholders' right to show cause why the privilege should not be upheld. *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970); *accord Cohen v. Uniroyal*, 80 F.R.D. 480 (E.D.Pa.1978); also see *Broad v. Rockwell International*, CCH Sec.L.Rep. ¶ 95,894 (N.D.Tex.1977).

■ Secondly, the Special Audit itself, and thus AY's Special Review binders as a part thereof, should be treated as work product in anticipation of litigation. The Fifth Circuit has recently stated that litigation need not be imminent, so long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation. *United States v. Davis, supra*, at 1040. Most courts have treated internal investigations of questionable payments as having been done in anticipation of litigation, even when no particular suit had been filed or was being threatened. See *Upjohn v. United States, supra; In re Grand Jury Investigation* (Sun Oil), 599 F.2d 1224 (3d Cir. 1979); *In re Grand Jury Subpoena, issued to the General Counsel of John Doe, Inc.*, 599 F.2d 504 (2d Cir. 1979); *In re LTV Securities Litigation*, 89 F.R.D. 595 (N.D.Tex.1981); *United States v. Arthur Young, Inc.*, 496 F.Supp. 1152 (S.D.N.Y.1980); *In re Grand Jury Subpoena dated July 13, 1979*, 478 F.Supp. 368 (E.D.Wisc. 1979). From the initial SEC inquiry on March 3, 1976, the Board of Directors knew there was a likelihood of involvement in some sort of SEC proceedings, as well as a strong probability of shareholder suits.

■ The work product immunity extends to documents prepared in anticipation of prior, terminated litigation, regardless of the interconnectedness of the issues and facts. *In re Murphy*, 560 F.2d 326, 333–35 (8th Cir. 1977). *Panter v. Marshall Field & Co.*, 80 F.R.D. 718 (N.D.Ill.1978). ISC may therefore assert immunity of the binders from production, as the work product of a party's representative prepared in anticipation of litigation. However, the Court believes that at least at the outset of the investigation, the Special Audit Committee was coordinating the investigation, and that Watson, Ess and AY were each conducting its share of the review independently, although cooperating with one another. That is, up until May 23, 1977, AY was not working under the direction of Watson, Ess, and the material produced by AY during that period must be more properly viewed as accountant work product, and not attorney work product. From May 1977 on, for reasons not necessary to the resolution of this particular motion, Watson, Ess was seemingly "in the lead," and AY was under ISC instructions to limit their work to assisting Watson, Ess. Thus, this Court will view any material produced specifically at Watson, Ess' request as attorney work product, as well as AY special review material produced after May 23, 1977. See *In re Grand Jury Subpoena dated December 19, 1978, Issued to General Counsel, John Doe, Inc.*, 599 F.2d 504, 513 (2d Cir. 1979). The Court will not compel production of interview notes, whether taken by AY or Wat-

son, Ess, because attorney mental impressions, opinions or legal theories may be revealed therein. See *Upjohn v. United States, supra*, 101 S.Ct. at 688, as to special protection to be afforded notes of oral interviews.

■ There is insufficient evidence of any waiver by ISC of the attorney-client privilege or the work product protection either in its dealings with the SEC or by virtue of the 1976 audit or annual report. See *Diversified Industries v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977). *Champion International v. International Paper*, 486 F.Supp. 1328 (N.D.Ga.1980). *In re Grand Jury Subpoena Dated July 13, 1979*, 478 F.Supp. 368, 372–73 (E.D.Wisc.1979).

Having concluded that the bulk of AY Special Review binders are indeed work product produced in anticipation of litigation, the Court must next consider two highly significant facts in deciding whether to grant or deny the motion to compel: Who is seeking production? What is the cause of action? Plaintiffs are shareholders. They allege fraud.

*Lewis v. Kenneally* is a derivative suit, brought to enforce the rights of the Corporation and seeking redress for the Corporation itself. *Koenig* is a class-action shareholders' suit alleging that they have been injured by the officers, directors, and the Corporation.

■ Where a corporation is involved in a suit against its shareholders on a charge of acting inimically to those shareholders' interests, the protection of those interests as well as those of the corporation and of the public requires that the availability of the privilege be subject to the shareholders' right to show cause why it should not be upheld in the particular instance. *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103–04 (5th Cir. 1970). Some of the relevant factors a Court should consider are the nature of the shareholder's claim and whether it is obviously colorable, the bona fides of the shareholder, the necessity or desirability of the shareholder having the information and its availability from other sources, whether

the claim alleges activity that is criminal, illegal, or of doubtful legality, whether the communication relates to past or prospective actions, whether the communication consists of advice regarding the litigation in which the discovery is sought, the extent to which the communication is identified as opposed to a fishing expedition and, the risk of revealing trade secrets or other information in whose confidentiality the corporation has an interest for reasons extraneous to the litigation. *Id.*

In reaching this conclusion, the Fifth Circuit found two traditional exceptions persuasive. Both of these exceptions have relevance to the case at bar. The first is the "crime-fraud" exception, and the second is the "joint attorney" exception. *Id.* at 1102.

■ Communications made by a client to his attorney during or before the commission of a crime or fraud for the purpose of being guided or assisted in its commission are not privileged. *Id.* (Cites omitted).

■ The second exception arises in the "joint attorney" situation. When the same attorney acts for two or more parties having a common interest, neither party may exercise the privilege in a subsequent controversy with the other. *Id.* at 1103 (cites omitted). The court then cited *Pattie Lea, Inc. v. District Court*, 161 Colo. 493, 423 P.2d 27 (1967) (*en banc*), in which the court held a statutory accountant-client privilege did not protect a corporation from having to disclose to its own shareholders in a good faith derivative suit, communications from the corporation to its public accounting firm. The Colorado court relied on the joint-attorney exception by analogy, reasoning that the accountants had been employed by the corporation for the benefit of all shareholders.

■ Applying these principles to the case *sub judice*, this Court notes that the claims in both the *Lewis* derivative suit and the *Koenig* shareholder's securities fraud suit are obviously colorable claims brought in good faith by the Plaintiffs. This is not a "strike" suit by a shareholder. Further, the shareholders represented by the Plain-

tiffs and the two classes certified herein, represent a substantial number of outside shareholders. The claims allege activity by the Defendants that is at best of doubtful legality. The Plaintiffs are not on a blind "fishing" expedition; they know exactly what they want: the accountant work papers and files from the AY Special Review of ISC questionable payments. The communications dealt for the most part with past transactions. The Special Audit was motivated by ISC's desire to be considered a participant in the SEC's Voluntary Disclosure Program, and the documents do not contain advice regarding this particular litigation. No trade secrets would be revealed by disclosure of these documents.

But most important, the Plaintiffs allege causes of action based on fraud. The *Lewis* Amended Complaint, dated September 4, 1979, not only alleges that the individual Defendants caused, approved, and acquiesced in the illegal and unlawful diversion of ISC funds, from January 1970 through June 1977, but also that they "fraudulently and/or negligently failed to make appropriate inquiries to uncover" such activities, and failed to recover such funds on behalf of ISC when they became aware of the improper diversion of funds. (*Lewis* Complaint, page 2). To substantiate these allegations, the derivative suit is concerned not only with the actual diversion of funds or the making of sensitive payments, but also with when and to what extent the various named Officer and Director Defendants became aware of any improper transactions, and what actions they took or failed to take in the best interest of the Corporation and its shareholders, as opposed to their own best interests. The Lewis Complaint alleges wrongdoing by the Defendants up to June 1977.

The *Koenig* Amended Complaint names as Defendants not only individual officers and directors of ISC and the Corporation itself, but also Arthur Young & Co. Koenig alleges that Arthur Young participated in the wrongs and by its silence aided the conspiracy to defraud purchasers of ISC stock during the class period. The beginning date of the Koenig class, December 6, 1976, is the date that AY certified the financial statements for ISC's FY 1976 Annual Report. Koenig contends that "the extent of such [illegal] payments was so far understated as to be demonstrably false and fraudulent." (*Koenig* Amended Complaint, page 16.) Koenig claims that purchasers during the class period relied on the 1976 annual report and were harmed by its inadequacies.

In order to establish its claim of either "knowing or reckless" action on the part of AY, it is essential to Koenig's case in chief that he be able to show exactly how much AY knew and when they first knew it. His primary interest lies therefore, as to this cause of action, not in the underlying facts of the Special Review, which indeed he may well be able to learn elsewhere, albeit at incredible expenditure of time and money, but rather in the documents *as documents*; that is, what did AY know prior to the certification of the 1976 financial statements? Both Lewis and Koenig have a clear need for access to the Special Review binders.

■■■■ Furthermore, the crime-fraud exception to the attorney-client privilege applies to the work product immunity as well. *In re Grand Jury Proceedings*, 604 F.2d 798 (3d Cir. 1979). Under Fed.R.Civ.P. 26(b)(3), this would include any work product immunity claimed as to a representative of the party. Thus when a lawyer or other representative is consulted not with regard to past wrongdoing but as to future fraudulent activities, the privilege is no longer defensible, and the crime-fraud exception comes into play. See *In re Grand Jury Proceedings*, 604 F.2d at 802. If the fraud is committed before the attorney or other representative is consulted, the privilege or work product immunity would prevail. But if the fraud is continuing or occurs after the firm is consulted, the privilege or immunity fails if the one seeking production makes a prima facie showing of fraud. *Id.*

In the case at bar, the claims of the Koenig class are not based on the fact that ISC made certain questionable payments

but on the fraudulent concealment of pertinent facts which affected the reporting of assets, receivables, and the shakiness of certain contracts. In his complaint Koenig maintains that AY assisted in this fraud, particularly by its actions *after* they were engaged to participate in the special review, and continuing at least until they certified the 1976 financial statements.

The Court finds that the Plaintiffs have made out a prima facie case of fraud against the various Defendants, at least for the purpose of discovery. The alleged fraud was on-going through the period from which production is sought. There would appear to be a basic injustice in denying discovery to the "joint-clients," a sizeable number of shareholders who in a sense paid for the special review; this is particularly true of the derivative Plaintiff who raises the issue of whether the officers and directors breached their fiduciary duty in the way they failed to act upon the information uncovered in the special review. It would be inappropriate to let the Corporation's invocation of AY's work product immunity prevail under the circumstances of this case. See *Cohen v. Uniroyal*, 80 F.R.D. 480 (E.D.Pa.1978); *In re Transocean Tender Offer Securities Litigation*, MDL–223, 78 F.R.D. 692 (N.D.Ill.1978); *Broad v. Rockwell International*, CCH Sec. L.Rep. ¶ 95,894 (N.D.Tex.1977). This same conclusion pertains to AY material that might be considered "attorney work product" as well as "accountant work product."

And finally, the Court is unpersuaded that the Corporation itself nor any non-party shareholders would be damaged to any great extent by the discovery of these documents. The damage to ISC and the value of its stock resulting from the underlying facts of this case has already occurred.

Therefore, the Court will order production of all material in the AY Special Review binders other than itemized documents which might reveal Watson, Ess attorney opinion or legal theories, whether such items are described as being within the attorney-client privilege or as attorney work product. Although the withheld documents remain vulnerable to a strong showing of need under the *Wolfinbarger* criteria, Plaintiffs have not demonstrated at this time the extraordinary need or total unavailability elsewhere that Rule 26(b)(3) and *Upjohn v. United States* require for this type material. There are no allegations of fraud on the part of Watson, Ess that would justify such an intrusion on their opinion work product, especially notes of oral interviews. Production will be ordered as to those documents containing communications between AY and in-house counsel of ISC or its subsidiaries, based on the fraud exception and the application of *Garner v. Wolfinbarger* criteria.

This result is in accord with the leading cases where discovery was sought of similar material. In several such cases denying discovery, it was the Government, not a shareholder, who was seeking discovery, and there was the possibility of ensuing criminal charges. See *Upjohn v. United States, supra, In re Grand Jury Investigation* (Sun Oil), 599 F.2d 1224 (3d Cir. 1979); *In re Grand Jury Subpoena Issued to the General Counsel of John Doe*, 599 F.2d 504 (2d Cir. 1979); *United States v. Arthur Young*, 496 F.Supp. 1152 (S.D.N.Y.1980); *In re Grand Jury Subpoena Dated July 13, 1979*, 478 F.Supp. 368 (E.D.Wisc.1979). Discovery of responses to questionnaires, attorney notes of oral interviews, memoranda or conversations between the attorney and the client and, final law firm reports to the corporation and other material prepared by outside counsel have consistently been protected from discovery by the Government or non-shareholder third parties. *Upjohn, supra; In re Grand Jury Subpoena Issued to General Counsel of John Doe, supra; Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1977) (*en banc*); *In re LTV Securities Litigation*, MDL–371, 89 F.R.D. 595 (N.D.Tex.1981). Similar material is being denied discovery in this case also, at this time.

Two cases denied discovery of accountant work papers relating to sensitive foreign payments. They present different fact situations from the case *sub judice*. In *United*

*States v. Arthur Young & Co., supra,* the court denied the Internal Revenue Service's motion to compel production of AY's Special Review binders, because IRS had not demonstrated a need for these documents. 496 F.Supp. at 1158. The court in *In re Grand Jury Subpoena Dated July 13, 1979, supra,* also denied discovery to the U. S. Attorney of similar work papers which were in the possession of the attorney, where the court specifically found the worksheets were prepared under the direction of and at the request of the law firm. 478 F.Supp. at 376.

In this order this Court grants discovery only as to accountant worksheets which were not indisputedly prepared at the request of or under the direction of the outside counsel. This discovery is granted to shareholders, to whom such evidence is essential in establishing a claim of fraud against the accounting firm.

 Pre-existing documents, not privileged in the hands of the client, are not immune from production. *U. S. v. Davis, supra,* at 1040; *McCormick, Handbook of the Law of Evidence,* § 89 at 185 (Cleary rev. 2d ed. 1972); 2 *Weinstein's Evidence* ¶ 511[02] at page 511–5, ¶ 1. However, material selected from a larger group, and assembled meaningfully, are protected as work product. Therefore, letters from Watson, Ess, or responding to requests from Watson, Ess, with their assembled attached exhibits, are being denied production. The underlying facts contained in these documents can probably be obtained by deposition. Since ISC has the burden of proof, undated material is being granted production. Where there is doubt as to whether AY or Watson, Ess assembled documents, the Court will infer from their presence in AY files that AY prepared them.

Documents revealing lists of those interviewed or to be interviewed are not privileged; ISC has repeatedly stated they will provide a list of those interviewed to Plaintiffs.

 ISC has requested that even its abstract of the documents it claims are immune from discovery be considered privileged; however, it has consistently been held that the work product privilege does not shield from discovery the underlying facts the party's representative learned, the persons from whom he learned such facts, or the existence of certain documents. 8 *Wright & Miller, Federal Practice and Procedure,* § 2023 at page 194. Therefore, the Court will use ISC's abstract itself to describe which documents are to be produced and which will be protected. The Court believes this is the best way to ensure full and accurate compliance with this Order.

Arthur Young has a duty to advise the Court of any inaccurate or misleading descriptions of documents being withheld from production.

## CONCLUSION

Plaintiffs Koenig and Lewis's motion to compel production of AY's Special Review binders is granted in part and denied in part. The motion is granted as to all material not listed on the attached appendix, and also as to the following items listed thereon: 2, 3, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 20, 22, 24, 25, 26, 27, 28, 29, 32, 35, 37, 43, 45, 47, 48, 50, 51, 52, 53, 59, 64, 67, 68, 69, 78, 85, 88, 89, 100, 101, 107, 110, 111, 114, 115, 116, 117, 118, and 120.

The motion to compel production is denied as to the following items: Documents No. 1, 4, 6, 7, 18, 19, 21, 23, 30, 31, 33, 34, 36, 38, 39, 40, 41, 42, 44, 46, 49, 54, 55, 56, 57, 58, 60, 61, 62, 63, 65, 66, 70, 71, 72, 73, 74, 75, 76, 77, 79, 80, 81, 82, 83, 84, 86, 87, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 102, ·103, 104, 105, 106, 108, 109, 112, 113, 119, 121, 122, and 123.

## APPENDIX

### PARTIAL ABSTRACT OF ARTHUR YOUNG SPECIAL REVIEW BINDERS

### I. IDENTIFICATION OF INDIVIDUALS AND COMPANIES

*Watson, Ess, Marshall & Engass:*

1. John F. Marvin—partner of law firm in charge of the Special Review investigation.

2. Allan L. Bioff—attorney assisting in the Special Review investigation.

3. Landon Rowland—attorney assisting in the Special Review investigation.

4. Robert C. Canfield—attorney assisting in the Special Review investigation.

5. Charles E. Patterson—attorney assisting in the Special Review investigation.

6. Danny R. Carpenter—attorney assisting in the Special Review investigation.

7. Dennis R. Rilinger—attorney assisting in the Special Review investigation.

*Arthur Young & Co. and Affiliates*:

1. Robert F. Teague—accounting firm's partner in charge of firm's work in the Special Review investigation.

2. J. T. Turner—accountant assisting in Special Review investigation.

3. Duane Schaefer—accountant assisting in Special Review investigation.

4. David Pope—partner in Arthur Young's Houston Office.

5. Sid Spradlin—partner in Arthur Young's Regional Office in Dallas.

6. W. I. Webster—partner in Arthur Young's Houston Office.

7. Guy Chamberlain—Arthur Young-Clarkson Gordon & Co. accountant in Montreal, Canada.

8. J. H. McMahon—Arthur Young-Clarkson Gordon & Co. accountant in Edmonton, Canada.

9. R. A. Lent—accountant with Midwest Regional Office of Arthur Young.

10. Richard Martin—accountant with Kansas City Office of Arthur Young.

11. J. O. R. Darby—Arthur Young-McClellan Moores & Co. accountant in London, England.

12. Gotthilf Schmid—accountant with Arthur Young affiliate in Zurich, Switzerland.

13. R. Huisma—accountant with Arthur Young affiliate in The Hague, Netherlands.

14. A. Voskamp—accountant with Arthur Young affiliate in The Hague, Netherlands.

*ISC and Subsidiaries*:

1. B. G. Motley—Controller of ISC.

2. R. G. Hofker—Vice-President and counsel of ISC.

3. H. M. Frietsch—Senior Vice-President of ISC.

4. Peter Oberleitner—Project Director for the Gilan project in Iran for Stadler-Hurter, Limited (SHL).

5. James Donnelly—Executive Vice-President of SHL.

6. Max Zeier—Chairman of Stadler-Hurter Zurich, A. G., a subsidiary of SHL.

7. Harlan Stein—Engineering Group President for ISC engineering subsidiaries.

8. J. J. Romanek—Group Counsel (attorney) for the ISC Engineering Group of subsidiaries.

9. Bruce Miller—Vice-President of Sanderson & Porter, Inc.

10. Paul Renna—Controller of Sanderson & Porter, Inc.

*Audit Committee of ISC Board of Directors*:

1. Austin C. Wilson—non-employee member of the ISC Board of Directors.

2. Dr. Robert Medina—non-employee member of the ISC Board of Directors.

*Surrey, Karasik & Morse*:

1. Walter S. Surrey—partner of the Washington, D. C. law firm of Surrey, Karasik & Morse (SKM) that represented ISC.

2. Charles Reed—attorney with the SKM law firm that represented ISC.

*ISC Subsidiaries*:

1. Sanderson & Porter, Inc.—abbreviated "S & P".

2. Pritchard-Rhodes, Limited—abbreviated "PRL".

3. J. F. Pritchard & Company—abbreviated "JFP".

4. Black Sivalls & Bryson, Inc.—abbreviated "BS&B".

5. Lang Engineering Corporation—abbreviated as "Lang" (formerly known as Pemar).

7. Stadler-Hurter, Limited—abbreviated as "SHL".

8. Verkor, N. V.—abbreviated as "Verkor".

## II. IDENTIFICATION OF CATEGORIES OF DOCUMENTS

In the section that follows, certain documents in the Arthur Young Special Review workpapers have been identified in separate columns labeled: (1) description of document, (2) category, (3) date of document, and (4) number of pages of the document. The inclusion of a separate column labeled "Category" was thought to be helpful since some of the documents fall within the attorney-client privilege, some documents fall within the work-product privilege, and some documents fall within both privileges. The separate column for "Category" was also thought to be helpful since Rule 26(b)(3) of the Federal Rules of Civil Procedure defines work-product to include documents prepared "by or for" a party (ISC) or "by or for" a "party's representative" (Watson, Ess or Arthur Young). The following index lists what each number under the column "Category" represents.

Category No. 1: documents within the attorney-client privilege.

Category No. 2: documents prepared *by a party (ISC)* in anticipation of litigation and thus within the work-product privilege.

Category No. 3: documents prepared *by a party's representative (Watson, Ess or Arthur Young)* in anticipation of litigation and thus within the work-product privilege.

Category No. 4: documents prepared *for a party (ISC)* in anticipation of litigation and thus within the work-product privilege.

Category No. 5: documents prepared *for a party's representative (Watson, Ess or Arthur Young)* in anticipation of litigation and thus within the work-product privilege.

Category No. 6: documents *assembled* as part of the Special Review by either Watson Ess or Arthur Young from ISC's files or a subsidiary's files. "To the extent documents are 'assembled' by or for a party or his representative into a meaningful product, the contents of that assemblage is work-product sheltered from disclosure". *In re LTV Securities Litigation*, Fed.Sec.L.Rep. [Current] ¶ 97,969, pp. 90,981, 90,994 (N.D.Tex.1981).

### III. IDENTIFICATION OF DOCUMENTS

| Description of Document | Category | Date of Document | Number of Pages |
|---|---|---|---|
| 1. Letter by Marvin to Teague detailing what specific information should be included in the Arthur Young draft report of the Special Review with attached exhibits. | No. 3, 5 | 08/24/77 | 9 |
| 2. Draft report of Arthur Young containing Arthur Young's tentative conclusions in the Special Review. | No. 3, 4, 5 | unknown, but subsequent to 08/24/77 | 120 |
| 3. Memorandum by Motley responding to questions raised by Arthur Young's tentative conclusions in its draft report from the Special Review. | No. 2 | 07/14/77 | 7 |
| 4. Letter by Carpenter to Audit Committee requesting specific information regarding Lang and Pemar subsidiaries that Arthur Young may have together with attached exhibits. | No. 3 | 03/21/77 | 11 |
| 5. Subsidiary-by-subsidiary summary prepared by Arthur Young of the status of the | No. 3, 4, 5 | undated | 80 |

APPENDIX—Continued

| Description of Document | Category | Date of Document | Number of Pages |
|---|---|---|---|
| Special Review and suggestions of areas for future consideration. In addition to the final draft of the summary, there are earlier drafts of the summary also. | | | |
| 6. Letter from Carpenter to Teague requesting information from Arthur Young on certain specific commission payments together with attached exhibits. | No. 3, 5 | 09/26/77 | 19 |
| 7. Letter by Rilinger to Teague requesting Arthur Young to supply additional information with respect to certain specific commission payments, together with attached exhibits. | No. 3, 5 | 10/05/77 | 13 |
| 8. Summary of ISC's Swiss bank account transaction by subsidiary prepared by Arthur Young in connection with the Special Review. | No. 3, 4, 5 | no date shown | 46 |
| 9. Subsidiary-by-subsidiary listing of all wire transfers during the period covered by the Special Review. Document prepared by Arthur Young as part of the Special Review. | No. 3, 4, 5 | no date shown | 246 |
| 10. Subsidiary-by-subsidiary listing of commissions paid to agents which were investigated by Arthur Young. This document prepared as part of the Special Review by Arthur Young. | No. 3, 4, 5 | no date shown | 164 |
| 11. Listing of Commission payments by JFP by contract with customer, together with attached exhibits. This document prepared by Arthur Young as part of the Special Review. | No. 3, 4, 5 | no date shown | 42 |
| 12. Memo by Arthur Young (Rio de Janiero office) to Teague reporting on its conclusions concerning S & P commission payments, together with attached exhibits. | No. 3 | 09/09/76 | 13 |
| 13. Memo by Arthur Young (Brussels office) reporting on the conclusions concerning Verkor commission payments, together with attached exhibits. | No. 3 | 06/15/77 | 6 |
| 14. A memo by Arthur Young (Montreal Office) to Teague reporting on the conclusions concerning SHL commission payments in Iran. | No. 3 | 07/25/77 | 9 |
| 15. Listing of all ISC intercompany transfers by fiscal year for the entire period covered by the Special Review. This document prepared by Arthur Young as part of the Special Review. | No. 3, 4, 5 | no date shown | 40 |
| 16. Summary of BS&B commission payments. This document prepared by Arthur Young as part of the Special Review. | No. 3, 4, 5 | no date shown | 50 |
| 17. Summary of payments of all kinds made by ISC to its subsidiaries. This document | No. 3, 4, 5 | no date shown | 28 |

APPENDIX—Continued

| Description of Document | Category | Date of Document | Number of Pages |
|---|---|---|---|
| prepared by Arthur Young as part of the Special Review. | | | |
| 18. Copies of SHL documents assembled by Watson Ess attorneys for SHL files as part of the Special Review. | No. 6 | various dates | 159 |
| 19. Letter from Carpenter to Teague regarding Lang commission payments, with attached documents. | No. 3, 5, 6 | 02/18/77 | 331 |
| 20. Listing by Arthur Young of certain commission agents and commission payments investigated by Arthur Young as part of the Special Review. | No. 3, 5 | 09/24/76 | 11 |
| 21. Copies of SHL documents assembled by Watson Ess from the SHL files as part of the Special Review. | No. 6 | no date shown | 52 |
| 22. List of individuals at Lang who were interviewed by Watson Ess as part of the Special Review. | No. 3 | no date shown | 1 |
| 23. Notes by Teague of an interview by Watson Ess attorneys of Ray Hofker done as part of the Special Review. | No. 3 | 02/02/77 | 1 |
| 24. Telex by Teague to Voskamp at Arthur Young—The Hague requesting a list of commission payments previously provided to Watson Ess. There is a return telex furnishing a listing of those commission payments. | No. 3, 5 | 09/13/77 | 4 |
| 25. A letter by Arthur Young—The Hague reporting its conclusions in the Special Review of BS&B, E. H. | No. 3, 5 | 08/25/76 | 5 |
| 26. Handwritten notes of Arthur Young accountants reporting on Arthur Young's conclusions concerning the Special Review of S&P with copies of relevant documents attached. | No. 3, 5 | 09/09/76 | 22 |
| 27. Handwritten notes of an interview done as part of the Special Review with the treasurer of S&P regarding commission payment practices of S&P. | No. 3, 5 | 08/18/76 | 3 |
| 28. Handwritten notes prepared as part of the Special Review by Arthur Young accountant summarizing S&P commission payments on Saudi Arabian projects. | No. 3, 5 | 09/02/76 | 3 |
| 29. Copies of S&P documents relating to commission payments assembled by Watson Ess or Arthur Young from the S&P as part of the Special Review. | No. 6 | no date shown | 53 |
| 30. Memo from Turner to the file discussing a specific commission payment that was discussed in one of the Watson Ess interviews of SHL personnel. | No. 3 | 09/26/76 | 3 |
| 31. Memo from Turner to Teague discussing specific commission arrangement and the testimony of an SHL employee in his | No. 3 | 10/22/76 | 2 |

APPENDIX—Continued

| Description of Document | Category | Date of Document | Number of Pages |
|---|---|---|---|
| Watson Ess interview concerning such commission arrangement. | | | |
| 32. Memo from Turner to Teague regarding tax treatment of certain commission payments investigated in the Special Review. | No. 3 | 10/28/76 | 2 |
| 33. A listing of commission payments by SHL on its projects in Iran prepared by the Watson Ess firm as part of the Special Review. | No. 3 | no date shown | 1 |
| 34. Extensive typewritten notes of meeting between members of the Audit Committee, Watson Ess lawyers (Carpenter, Bioff and Marvin) and Arthur Young accountants (Pope, Teague and Turner) reviewing the status of the Special Review. The memo attempts to summarize what was said by each person during the meeting. | No. 1, 3 | no date shown | 25 |
| 35. Copies of SHL documents relating to commission payments on Gilan project. These documents were assembled by Watson Ess or Arthur Young from the SHL files as part of the Special Review. | No. 6 | no date shown | 5 |
| 36. A letter by Reed to the SEC enclosing a "memorandum" summarizing the status of certain sensitive payment matters under investigation. The memorandum is in generic form and confidential, non-public treatment of the letter is requested under federal statutes and SEC rules. | No. 3 | 05/07/76 | 11 |
| 37. A draft of the staff report to the Special Committee of ISC's Board done by Hofker, counsel for ISC, and Romanek, an in-house attorney for ISC. | No. 1, 2 | 06/24/76 | 54 |
| 38. Letter from Marvin to the Audit Committee regarding obtaining information on specific Swiss bank accounts, together with attachments. | No. 1, 3 | 03/18/77 | 13 |
| 39. Letter from Marvin to the Audit Committee regarding plans for concluding document review and interviews of SHL employees. | No. 1, 3 | 03/10/77 | 6 |
| 40. Letter from Carpenter to the Audit Committee regarding interview of ISC employee in connection with investigation of Lang subsidiary. | No. 1, 3 | 02/18/77 | 2 |
| 41. A memo from Teague to the file reflecting the contents of a telephone conversation with Marvin about the status of the Special Review, and handwritten notes of the same telephone conversation. | No. 1, 3 | 10/26/76 | 8 |
| 42. Handwritten notes of Teague reflecting the contents of discussions between Watson Ess attorneys, Arthur Young accountants, and the Audit Committee concerning the status of the Special Review. | No. 1, 3 | 10/01/76 | 2 |

APPENDIX—Continued

| Description of Document | Category | Date of Document | Number of Pages |
|---|---|---|---|
| 43. Subsidiary-by-subsidiary status report by Arthur Young to the Audit Committee regarding the Special Review. | No. 3, 4, 5 | 10/01/76 | 8 |
| 44. Memo from Teague to the file reflecting the content of discussions of a meeting with Watson Ess attorneys and Hofker concerning the Special Review status. | No. 1, 3 | 09/23/76 | 1 |
| 45. Memo by Teague to the file detailing Teague's activities in the Special Review for the two preceding days. | No. 3 | 09/23/76 | 1 |
| 46. Memo from Teague to the file reflecting the content of discussions between Watson Ess and the Audit Committee on how to proceed with respect to matters involving the SHL subsidiary in the Special Review. The memo was prepared from handwritten notes taken by Teague of the meeting. | No. 1, 3 | 09/22/76 | 3 |
| 47. Memo from Teague to the file reflecting the content of discussions between Arthur Young accountants and Arthur Young's counsel concerning the Special Review status together with handwritten notes of the discussions. | No. 3 | 09/22/76 | 5 |
| 48. Memo from Arthur Young—Houston to Arthur Young—New York, enclosing a draft of a chronology of the events in the Special Review up to the date of the memo. | No. 3 | 09/21/76 | 8 |
| 49. Memo by Teague to the file detailing his activities in the Special Review for the week of September 13, 1976. The memo contains the mental impressions of Watson Ess attorneys concerning the impact of certain documents in the Special Review. | No. 3, 5 | no date shown | 3 |
| 50. A letter from Turner to S&P subsidiary enclosing questionnaires to be distributed to ten named individuals. | No. 3 | 08/05/76 | 1 |
| 51. A letter from Turner to SHL subsidiary enclosing questionnaires to be distributed to ten named individuals. | No. 3 | 08/05/76 | 1 |
| 52. Memo by Teague to Webster, Pope and Turner, as well as the file, updating the status of the Special Review as of the date of the memo. | No. 3 | 09/07/76 | 3 |
| 53. Draft summary of the status of the Special Review as of date of document prepared by Arthur Young. | No. 3, 4, 5 | 09/15/76 | 12 |
| 54. Memo by Teague to Webster, Pope and the file revealing the contents of a meeting with Watson Ess attorneys in Kansas City concerning the status of the Special Review. | No. 1, 3 | 10/22/76 | 3 |
| 55. Memo by Arthur Young purporting to reflect in detail the substance of a meeting between Watson Ess attorneys, the Audit | No. 1, 3 | 10/25/76 | 5 |

APPENDIX—Continued

| Description of Document | Category | Date of Document | Number of Pages |
|---|---|---|---|
| Committee, Arthur Young accountants and SKM attorneys concerning tentative conclusions reached in the Special Review and legal theories concerning such conclusions. | | | |
| 56. Memo by Turner purporting to summarize discussions between the Audit Committee and Arthur Young accountants concerning the tentative conclusions of Watson Ess in the Special Review. | No. 3 | 09/28/76 | 18 |
| 57. Memo by Teague to Webster and Pope detailing the content of conversations with Marvin and Hofker concerning the conduct of the Special Review. | No. 1, 3 | 06/30/76 | 1 |
| 58. Letter by Marvin to Teague discussing initial steps to be taken in the Special Review. | No. 1, 3 | 07/19/76 | 1 |
| 59. Memo by Teague to Pope and Webster detailing Arthur Young's activities in the Special Review since June 1, 1976. | No. 3 | 07/14/76 | 1 |
| 60. Memo by Teague to the file regarding a meeting between Marvin, Teague and SKM lawyers concerning the Special Review. | No. 1, 3 | 06/23/76 | 1 |
| 61. Memo by Teague to Pope and Turner detailing the content of discussions between Marvin and Teague concerning the conduct of the Special Review. | No. 1, 3 | 06/18/76 | 3 |
| 62. Memo by Teague to the file purporting to summarize in detail what was said by participants in a meeting at the SEC on April 27, 1976. The participants included attorneys for ISC from Fulbright & Jaworski (ISC's in-house attorneys), attorneys for ISC from SKM, Pope and Teague of Arthur Young, and personnel from the SEC. Also included are the handwritten notes of Teague from which the memo was prepared. | No. 1, 3 | 04/30/76 | 8 |
| 63. Memo by Pope to Webster and Teague marked "confidential" detailing the content of discussions with SKM attorneys and the SEC concerning commission payments. | No. 1, 3 | 04/15/76 | 2 |
| 64. Memo by Lent (Midwestern Regional office of Arthur Young) to Teague marked "confidential" reflecting Lent's conclusions and mental impressions concerning PRL document review conducted in London and Montreal. | No. 3 | 04/04/77 | 1 |
| 65. Typewritten and handwritten notes purporting to detail the statements made by each participant at a meeting at the SEC concerning the status of the Special Review. The participants included Marvin of Watson Ess, Reed of SKM, Teague and Pope of AY, and SEC personnel. Memo | No. 3 | 11/08/76 | 22 |

APPENDIX—Continued

| Description of Document | Category | Date of Document | Number of Pages |
|---|---|---|---|
| reflects the mental impressions and legal conclusions of Marvin and Reed. | | | |
| 66. Handwritten notes of Teague detailing the discussions at a meeting between Teague, Pope, Marvin, Reed, Surrey, Medina and Wilson. The meeting discussed the legal position that would be taken in the meeting with the SEC noted in No. 66. | No. 1, 3 | 11/08/76 | 1 |
| 67. Handwritten notes by Arthur Young setting forth certain commission payments on Iranian contracts, together with attached documents. | No. 3 | 09/23/76 | 4 |
| 68. A memo by Martin (KC office of Arthur Young) to Turner summarizing his conclusions concerning the Special Review investigation of JFP subsidiary. | No. 3 | 11/10/76 | 5 |
| 69. Memo by McMahon (Edmonton, Canada office of Arthur Young) to Teague summarizing his conclusions as a result of the Special Review investigation of BS&B, Ltd. | No. 3 | 09/08/76 | 3 |
| 70. Draft of a letter by Wilson and Medina of the Audit Committee to Watson Ess reviewing the status of numerous document requests made by Watson Ess. | No. 1, 2 | no date shown | 7 |
| 71. Letter by Rilinger to Teague requesting an itemization by Arthur Young of certain commission payments by a PRL agent. | No. 1, 3 | 04/19/77 | 1 |
| 72. A letter from Marvin to the Audit Committee discussing the need for obtaining certain specific documentation in the Special Review. | No. 1, 3 | 04/13/77 | 2 |
| 73. A letter by Marvin to Hofker discussing persons remaining to be interviewed in the Special Review and unfinished document review. | No. 1, 3 | 03/23/77 | 2 |
| 74. A letter by Marvin to the Audit Committee entitled "A Status Report" on the Special Review and a listing of what remains to be done in the Special Review. There is attached to the letter a schedule entitled "Proposal for Completion of ISC Special Audit With Regard to JFP and PRL", "Proposal for Completion of ISC Special Audit With Regard to Sanderson & Porter", "Suggested Schedule for Remaining Work Relating to Stadler Hurter", and "Suggested Schedule for Remaining Work Relating to Lang", all prepared by Watson Ess. | No. 1, 3, 4 | 02/07/77 | 13 |
| 75. A letter by Rilinger to the Audit Committee requesting numerous specific documents as part of the Special Review, with attached exhibits. | No. 1, 3, 4 | 01/12/77 | 14 |
| 76. A letter from Marvin to Teague requesting verification of certain commission payments. | No. 1, 3 | 01/07/77 | 1 |

APPENDIX—Continued

| Description of Document | Category | Date of Document | Number of Pages |
|---|---|---|---|
| 77. A letter by Rilinger to the Audit Committee requesting instructions concerning the handling of a specific document relating to the S&P subsidiary, together with the attached document. | No. 1, 3 | 12/07/76 | 7 |
| 78. A memo from Teague to the file and to Pope detailing the substance of a telephone conversation between Teague and attorney Reed with SKM concerning certain questionable payments in the Special Review. | No. 1, 3 | 11/10/76 | 1 |
| 79. Letter by Carpenter to the Audit Committee detailing the content of discussions between the Audit Committee and Watson Ess attorneys concerning the ownership of certain companies alleged to have received commissions. | No. 1, 3 | 12/03/76 | 2 |
| 80. A letter by Carpenter to the Audit Committee requesting certain specific documents in connection with a commission payment investigated in the Special Review, together with attached enclosures. | No. 1, 3 | 12/02/76 | 6 |
| 81. A letter by Rilinger to the Audit Committee requesting numerous documents concerning the S&P subsidiary, commission payments and bank accounts, together with attached enclosures. | No. 1, 3 | 11/30/76 | 8 |
| 82. Letter from Marvin to the Audit Committee concerning individuals who received questionnaires as part of the Special Review. | No. 1, 3 | 11/15/76 | 4 |
| 83. A letter by Carpenter to the Audit Committee requesting numerous SHL documents concerning commission payments and bank accounts. | No. 1, 3 | 10/27/76 | 7 |
| 84. A letter from Carpenter to Hofker requesting documents involving the Lang subsidiary in the Special Review. | No. 1, 3 | 11/12/76 | 1 |
| 85. A letter by Carpenter to the SHL subsidiary enclosing questionnaires for approximately ten named individuals as part of the Special Review. | No. 1, 3 | 11/12/76 | 2 |
| 86. Handwritten notes by Teague of a meeting at the SKM offices involving Pope, Teague, Marvin, Reed and Surrey that reveals the contents of discussions concerning the status and progress of the Special Review. | No. 1, 3 | 11/08/76 | 2 |
| 87. Handwritten notes by Teague of a meeting with Reed, Surrey, Marvin and Teague discussing the status and progress of the Special Review. | No. 1, 3 | 11/01/76 | 1 |
| 88. A handwritten schedule of SHL commission payments on specific project prepared by Arthur Young. | No. 3 | 09/17/76 | 1 |

| Description of Document | APPENDIX—Continued Category | Date of Document | Number of Pages |
|---|---|---|---|
| 89. Memo by Teague to the file detailing the content of telephone conversations with Wilson of the Audit Committee concerning Arthur Young's responsibilities in the Special Review. There is also a letter by Teague to Wilson dated May 12, 1977, discussing the same conversations disclosed in the memo by Teague. | No. 3 | 05/16/77 | 2 |
| 90. A letter by Marvin to Audit Committee reporting on the status of the Special Review to date. | No. 1, 3 | 01/05/77 | 2 |
| 91. A letter by Marvin to the Audit Committee regarding individuals who have responded and not responded to questionnaires to date. | No. 1, 3 | 12/29/76 | 5 |
| 92. A letter by Carpenter to Hofker requesting information and documentation regarding the Lang subsidiary for the Special Review, with attached documents. | No. 1, 3 | 12/27/76 | 3 |
| 93. Handwritten notes by Teague disclosing the content of a meeting at Watson Ess between Wilson, Medina, Marvin, Roland and Teague regarding the status of the Special Review and open items that required action. | No. 1, 3 | 12/17/76 | 1 |
| 94. A letter by Marvin to a third party assisting in the Special Review discussing the interview of an individual taken in connection with the Special Review. | No. 3 | 11/11/76 | 2 |
| 95. A memo by Teague to the file reflecting the results of a trip to Watson Ess by Webster, Spradlin and Teague as part of the Special Review. The memo contains the substance of conclusions expressed by Watson Ess attorneys to Teague concerning findings in the Special Review. | No. 1, 3 | 11/10/77 | 3 |
| 96. Letter by Teague to Rilinger reviewing the status of 14 items that constituted open points in the Special Review. | No. 1, 3 | 09/21/77 | 4 |
| 97. Letter by Teague to Carpenter reporting on the status of Arthur Young's attempt to locate specific documents requested by Watson Ess. The documents which were located are attached to the letter. | No. 1, 3 | 09/19/77 | 20 |
| 98. A memo by Teague to the file and to Pope containing the substance of an interview in the Special Review conducted by Watson Ess. | No. 1, 3 | 09/19/77 | 1 |
| 99. Handwritten notes by Teague reflecting the substance of an interview conducted as part of the Special Review. | No. 1, 3 | 09/14/77 | 2 |
| 100. Handwritten notes by Teague concerning the contents of report on the status of the Special Review. | No. 1, 3 | 09/15/77 | 7 |

| Description of Document | APPENDIX—Continued Category | Date of Document | Number of Pages |
|---|---|---|---|
| 101. A letter by the Audit Committee to Teague detailing the conclusions reached during a meeting concerning the completion of Arthur Young's work on the Special Review. | No. 2 | 09/09/77 | 2 |
| 102. A letter by Rilinger to Teague requesting specific documentation relating to the PRL subsidiary. | No. 1, 3 | 08/26/77 | 5 |
| 103. A memo from Turner to Teague responding to specific requests for information made by Watson Ess of Arthur Young in the document identified as No. 102, together with attached documents. | No. 3 | 09/13/77 | 9 |
| 104. Memo by Turner to Teague providing answers to specific requests for information made by Watson Ess of Arthur Young in the document identified as No. 102, together with attached documents. | No. 3 | 09/13/77 | 13 |
| 105. Handwritten memo by Schaefer to Teague responding to requests for information made by Watson Ess of Arthur Young in the document identified as No. 102, together with attached documents. | No. 3 | no date shown | 3 |
| 106. Letter by Carpenter to Teague requesting copies of specific documents from Arthur Young concerning the Lang and SHL subsidiaries. | No. 1, 3 | 08/17/77 | 2 |
| 107. Status report of the Special Review as of 7/12/77, prepared by Arthur Young. | No. 3, 4 | 07/12/77 | 15 |
| 108. Handwritten notes of Turner reflecting the content of a meeting between Turner, Rilinger and Carpenter updating Arthur Young on Watson Ess' recent findings in the Special Review. | No. 1, 3 | 07/07/77 | 7 |
| 109. A letter by the Audit Committee to Arthur Young summarizing the remaining work to be done in the Special Review for an upcoming meeting between Arthur Young, Watson Ess and the Audit Committee. The letter is very extensive and covers the status of the Special Review company-by-company. | No. 1, 2, 5 | 06/10/77 | 8 |
| 110. A subsidiary-by-subsidiary status report of the Special Review as of 5/20/77, prepared by Arthur Young. There is a cover letter by Teague to the Audit Committee enclosing the status report. | No. 3, 4 | 05/25/77 | 37 |
| 111. A memo from Pope to Teague and Webster relating the substance of an extensive telephone conversation between Pope and Marvin regarding Arthur Young's involvement in the Special Review. | No. 1, 3 | 05/31/77 | 2 |
| 112. A letter by the Audit Committee to Marvin responding to numerous document requests by the Watson Ess firm. The letter | No. 1, 2, 5 | 05/09/77 | 8 |

| APPENDIX—Continued | | | |
|---|---|---|---|
| Description of Document | Category | Date of Document | Number of Pages |
| encloses a letter by the Audit Committee to Watson Ess responding to document requests made by Watson Ess. | | | |
| 113. A letter by Carpenter to Teague enclosing certain SHL documents assembled from SHL files by Watson Ess in the Special Review. | No. 3 | 04/12/77 | 8 |
| 114. A memo by Gotthilf Schmid (Arthur Young-Zurich) to Turner enclosing bank records concerning SHL commission payments. | No. 3 | 12/22/76 | 2 |
| 115. A memo by Turner to the file containing his conclusions concerning an investigation into a specific series of commission payments in the Special Review, with attached documents. | No. 3 | 11/12/76 | 8 |
| 116. A listing prepared by either Arthur Young or Watson Ess of the apparent owners of certain numbered bank accounts investigated in the Special Review. | No. 3 | no date shown | 1 |
| 117. A memo from Turner to Teague regarding his conclusions concerning the investigation of a specific commission payment in connection with the Special Review. | No. 3 | 09/17/76 | 2 |
| 118. Telex from Turner to Guy Chamberland (Arthur Young-Clarkson Gordon—Montreal) requesting specific information concerning a specific commission payment in the Special Review. | No. 3 | 12/02/76 | 1 |
| 119. Copies of SHL documents assembled from the SHL files by Watson Ess in the course of the Special Review. | No. 6 | no date shown | 72 |
| 120. Typed notes dictated by Teague concerning his mental impressions and conclusions in reviewing the SHL documents sent to him and referred to in the foregoing item No. 119. There are also the handwritten notes of Teague from which this memo was dictated. | No. 3 | 09/20/76 | 11 |
| 121. Handwritten notes prepared by Teague purporting to summarize what was said by each participant at a meeting to review the problems in the Special Review. The participants included Watson Ess attorneys, Arthur Young accountants, Reed of SKM, Wilson from the Audit Committee, and officers of ISC. | No. 1, 3 | 09/20/76 | 4 |
| 122. Handwritten notes by Teague purporting to summarize what was said by each participant in a meeting to review specific items in the Special Review. The participants included Watson Ess attorneys, Arthur Young accountants and the Audit Committee. | No. 1, 3 | 10/11/76 | 1 |
| 123. Handwritten notes by Arthur Young accountant reflecting the content of the Watson Ess interview of an ISC employee. | No. 1, 3 | 10/09/76 | 4 |