**In re GRAND JURY SUBPOENA DATED JULY 13, 1979.**

**No. Misc. 695.**

United States District Court,
E. D. Wisconsin.

Oct. 3, 1979.

Joan F. Kessler, U. S. Atty. by Thomas E. Martin, Asst. U. S. Atty., Milwaukee, Wis., for United States.

Quarles & Brady by Thomas J. Donnelly, Milwaukee, Wis., pro se.

Arnold & Porter by Abe Krash, John M. Fedders, Leonard H. Becker and Cary M. Adams, Washington, D. C., for Philip Morris & Miller Brewing Co.

### DECISION and ORDER

MYRON L. GORDON, District Judge.

The issue presented in this controversy is whether, for the purpose of a grand jury investigation, the United States attorney may have access to documents in the possession of a law firm the bulk of which were prepared in connection with the firm's investigation into "questionable payments" by its clients. The law firm, Quarles & Brady, of Milwaukee, and its clients, Philip Morris, Inc. and Miller Brewing Co., a wholly owned subsidiary of Philip Morris, have moved to quash the subpoena of the aforementioned documents on the grounds that such materials are confidential attorney-client communications and are also the work-product of Quarles & Brady.

Pursuant to a court order the subpoenaed documents have been produced for *in camera* inspection. Having examined these documents, I find that the motion to quash the subpoena should be granted in part.

### I. FACTS

On July 13, 1979, the United States attorney's office for the eastern district of Wisconsin caused to issue a subpoena duces tecum which was served upon various attorneys at Quarles & Brady. The subpoena directed the attorneys to appear before a grand jury and produce the following documents:

"All books, records, files, memoranda, and papers which were generated, drawn up, compiled or otherwise written and committed to paper in the course of producing the report of Quarles & Brady to the Audit Committee of the Board of Directors of Philip Morris Industrial dated November 15, 1976, also known as the 'Quarles & Brady Report', including but not limited to:

"(1) Questionnaires completed by employees of Miller Brewing Company and/or any other individuals;

"(2) Statements written by employees of Miller Brewing Company and/or any other individuals;

"(3) Summaries of statements made by employees of Miller Brewing Company and/or any other individuals;

"(4) Memoranda, reports and notes of statements made by employees of Miller Brewing Company and/or any other individuals;

"(5) All accountant's workpapers, all statistical compilations, statistical summaries, schedules, computations and workpapers;

"(6) All appendix of documents; and

"(7) All documents specifically referenced within all records specified above."

The bulk of the aforementioned documents were prepared by Quarles & Brady or were prepared under its supervision during its representation of Philip Morris and Miller in connection with (i) potential disputes and litigation with the Internal Revenue Service concerning tax liabilities for the tax years 1973–74, and (ii) an internal investigation of "questionable payments" for the period of 1971–74, which related to disclosure obligations under the federal securities laws. In the course of their representation, attorneys from Quarles & Brady interviewed several dozen employees of Philip Morris and Miller, as well as two persons who were former employees of Miller.

Following the completion of these interviews, on November 15, 1976, Quarles & Brady rendered a written report regarding its investigation to the audit committee of the board of directors of Philip Morris. In addition to the internal audit committee, the report was disseminated to the Securities and Exchange Commission as part of the Commission's voluntary disclosure program. The report has also been delivered to a New York grand jury and to investigators of the Internal Revenue Service.

In considering the motion to quash the government's subpoena, I will consider various categories of subpoenaed material separately.

## II. EMPLOYEE QUESTIONNAIRES AND STATEMENTS

The first two items demanded in the July 13, 1979 subpoena were questionnaires and statements completed or written by employees of Miller or other individuals. My examination of the subpoenaed documents leads to the conclusion that they do not contain such questionnaires or statements.

Accordingly, I need not consider the validity of the government's subpoena with regard to these two categories of documents.

## III. SUMMARIES OR NOTES REGARDING EMPLOYEE STATEMENTS

The third and fourth categories of items subpoenaed by the government include summaries of statements and memoranda, reports and notes regarding statements made by employees and former employees of Miller. The documents turned over by Quarles & Brady to the court include attorneys' summaries of witnesses' responses to specific questions as well as more general notes made by counsel during the course of interviews with employees and two former employees of Miller.

The movants oppose release of the interview memoranda in question on the grounds that they are confidential attorney-client communications and are also the work product of Quarles and Brady. I will first consider the application of the attorney-client privilege with regard to these documents.

### A. Attorney-Client Privilege

In *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950), the court stated the criteria pertinent to the determination of whether the attorney-client privilege applies to a specific communication:

"The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

In this case, I must consider an element in addition to those just mentioned. Quarles & Brady was retained by the two corporations involved in this dispute, Miller and Philip Morris. The persons interviewed had not retained Quarles & Brady as their personal attorneys, and in fact many were represented during their interviews by a separate attorney. Thus, an additional issue in this dispute is whether the relationship between interviewees and the corporations was such as to allow the corporations to make a claim of attorney-client privilege with regard to the statements made during the interviews.

As to this issue, I am bound by the holding of the court of appeals for this circuit in *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487 (7th Cir. 1970), aff'd by equally divided Court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). In that case, the court stated:

> "We conclude that an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's attorney is privileged where the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment." Id. at 491–92.

The interviews in question all dealt with subjects related to the duties of the interviewees in their employment at Miller. Prior to the interviews, each prospective interviewee received a letter from the chairman of the board and chief executive officer of Philip Morris which stated in part:

> "As you probably have realized, you are among the persons to be interviewed. The purpose of this letter is to ask that you cooperate fully with counsel so that they may complete their investigation as quickly as possible, . . ."

The notes in question relate to the interviews of Miller employees conducted by attorneys from Quarles and Brady who had been retained by Miller and Philip Morris to conduct an internal investigation in anticipation of potential criminal or civil litigation. The interviews were conducted in private; the only persons in attendance were the Quarles & Brady attorneys, the interviewee, and in some cases, the interviewee's attorney. The Miller employees, at the direction of their superiors, took part in the interviews which dealt with the duties of the employees at Miller. Therefore, under the tests stated in *United Shoe Machinery* and *Harper & Row*, I find that the information given to Quarles & Brady was privileged at the time of the interviews.

The government contends, however, that Miller and Philip Morris waived any attorney-client privilege they might have had with regard to the interviews by virtue of the fact that the report produced by Quarles & Brady subsequent to the interviews was turned over to Philip Morris' internal audit committee, to the Securities and Exchange Commission, to a New York grand jury pursuant to a subpoena, and to an Internal Revenue Service investigator pursuant to a summons. The notes regarding the interviews which are the object of the instant subpoena have not been released to anyone outside of Quarles & Brady.

In my view, Miller and Philip Morris did not waive their attorney-client privilege with regard to the notes by virtue of the limited release of the report. The release of the report to the Philip Morris internal audit committee cannot be construed as a waiver of the privilege since it did not result in dissemination of the confidential information beyond the client itself.

Also, I do not believe that limited release of the report to the Securities and Exchange Commission, the Internal Revenue Service, and New York grand jury should preclude the corporations from asserting their attorney-client privilege as to the notes. It is apparent that voluntary cooperation with the Securities and Exchange Commission or with an Internal Revenue Service or grand jury investigation would be substantially curtailed if such coopera-

tion were deemed to be a waiver of a corporation's attorney-client privilege. I believe that such cooperation should be encouraged, and therefore I will not treat the release of the Quarles & Brady report to the Securities and Exchange Commission, Internal Revenue Service, or the New York grand jury as a waiver of the corporation's attorney-client privilege with regard to the notes.

In *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596 (8th Cir. 1977), the board of directors of Diversified authorized a law firm to conduct an investigation into allegations that Diversified had bribed purchasing agents of companies with whom Diversified had dealt. In the course of its investigation, the law firm interviewed employees of Diversified and summarized its conclusions in a report. The court held that the employee interviews and the report were privileged under the attorney-client doctrine. *Id.* at 611. Furthermore, with regard to the argument that Diversified had waived its privilege by surrendering privileged materials to the Securities and Exchange Commission, the court stated:

"We finally address the issue of whether Diversified waived its attorney-client privilege with respect to the privileged material by voluntarily surrendering it to the SEC pursuant to an agency subpoena. As Diversified disclosed these documents in a separate and nonpublic SEC investigation, we conclude that only a limited waiver of the privilege occurred. *See Bucks County Bank and Trust Company v. Storck,* 297 F.Supp. 1122 (D.Haw.1969). *Cf. United States v. Goodman,* 289 F.2d 256, 259 (4th Cir.), *vacated on other grounds,* 368 U.S. 14, 82 S.Ct. 127, 7 L.Ed.2d 75 (1961). To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers."

My conclusion regarding the government's waiver argument is by analogy also supported by the decision of the court in *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.,* 62 F.R.D. 454 (N.D.Ill.1974), aff'd, 534 F.2d 330 (7th Cir. 1976). In *Sylgab* the documents in question included correspondence between officers of Imoco-Gateway and the corporation's counsel. Subsequent to this correspondence, Imoco-Gateway's counsel sent a letter to Sylgab stating that Sylgab's patent, which was the subject of the suit between the parties, was invalid and therefore not infringed by Imoco-Gateway. In this letter, Imoco-Gateway's attorney apparently revealed some of the information which was contained in the correspondence between the officers of Imoco-Gateway and the corporation's attorney. Sylgab thus argued that Imoco-Gateway had waived its attorney-client privilege with regard to the correspondence.

The district court rejected the waiver argument stating:

"It is the opinion of this Court that a party cannot waive its privilege merely if its lawyer, bargaining on its behalf, contends vigorously and even in some detail that the law favors his client's position on a point in issue—whether that point is the contested validity of a patent or the contested validity of a contract or some other matter. Bargaining, like litigation itself, partakes of the adversary procedure. Negotiated settlements are to be encouraged, and bargaining and arguments precede such settlements. Clients and lawyers should not have to fear that positions on legal issues taken during negotiations waive the attorney-client privilege so that the confidential facts communicated to the attorney and the private opinions and reports drafted by an attorney for his client become discoverable. *American Optical Corporation v. Medtronic, Inc.,* 56 F.R.D. 426 (D.Mass. 1972); *IBM Corp. v. Sperry Rand Corp.,* 44 F.R.D. 10 (D.Del.1968)." *Id.* at 458.

In summary, I find that the notes taken by Quarles & Brady attorneys with regard to the interviews of Miller employees are privileged under the attorney-client doctrine and that neither Miller nor Philip Morris has waived the privilege as to those notes.

## B. *Work-Product Doctrine*

The scope of the attorney-corporate client privilege defined in *Harper & Row Publishers, Inc. v. Decker*, supra, does not explicitly extend to information communicated to counsel by former employees. Accordingly, with regard to the interview memoranda arising from interviews with former Miller employees, I am obliged to consider the work-product doctrine. My conclusion that the doctrine applies to such memoranda also serves as an alternative ground for my decision regarding the confidentiality of the interview memoranda arising from interviews with Miller employees.

■ The work-product doctrine, as defined in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), protects from discovery materials prepared or collected by an attorney "in the course of preparation for possible litigation." Id. at 505, 67 S.Ct. at 391. *See also*, Rule 26(b)(3), Federal Rules of Civil Procedure. The doctrine applies in criminal as well as in civil litigation. *See United States v. Nobles*, 422 U.S. 225, 236, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

■ In the instant case, all of the information gathered during the course of interviews with employees and former employees of Miller clearly falls within the scope of the work-product doctrine, as defined in *Hickman*. The government, however, maintains that there is sufficient justification for releasing the interview memoranda despite the fact that they are work-product. Specifically, the United States contends that production of the summaries of the interviews is necessary to:

"(1) refresh the recollection of immunized witnesses; (2) test the credibility of immunized witnesses; (3) present to the Grand Jury probative evidence of perjury, if any, of immunized witnesses; (4) present to the Grand Jury any incriminating statements by non-immunized witnesses so they may be held criminally responsible if the evidence so justifies; (5) enable the United States to make informed and appropriate choices as to immunizing corporate officials holding positions of policy-making responsibility; (6) otherwise pierce an evidentiary barrier construed by mutual silence which obstructs the Grand Jury's responsibility of seeking the facts."

The court in *Hickman* acknowledged that there would be situations in which discovery of work-product would be justified. 329 U.S. at 511–12, 67 S.Ct. 385. However, the court stated that "the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order." Id. at 512, 67 S.Ct. at 394.

In determining whether the government has made a sufficient showing to justify discovery of the interview memoranda, I am guided by the Court's statement in *Hickman* with regard to discovery of interview notes:

". . . [A]s to oral statements made by witnesses to [defendant's attorney], whether presently in the form of his mental impressions or memoranda, *we do not believe that any showing of necessity can be made under the [conditions] of this case so as to justify production.* Under ordinary [circumstances], forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness. No legitimate purpose is served by such production. The practice forces an attorney to testify as to what he remembers or what he saw fit to write down regarding witnesses' remarks. Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness. The standards of the profession would thereby suffer." Id. at 512–13, 67 S.Ct. at 394. (emphasis added).

At least two courts have interpreted this statement as absolutely barring the discovery of interview memoranda. *In re Grand Jury Proceedings,* 473 F.2d 840, 848 (8th Cir. 1973); *In re Grand Jury Investigation,* 412 F.Supp. 943, 949 (E.D.Pa.1976). At the very least, the Supreme Court's decision in *Hickman* supports the conclusion that interview memoranda may be discovered only in a "rare situation." 329 U.S. at 513, 67 S.Ct. 385.

I believe that the reasons advanced by the government are not sufficient to justify release of the interview memoranda. All of the persons interviewed by Quarles & Brady are apparently still alive and available to be called before the grand jury. Five of the interviewees have already been granted immunity for the purpose of grand jury testimony. While apparently some of the interviewees have indicated reluctance or refusal to testify in the absence of a grant of immunity, this is hardly an unusual or rare circumstance with regard to potential grand jury witnesses. The fact that interview memoranda regarding such witnesses might be helpful to the government's immunity decisions does not justify discovery of work-product. With regard to this contention, the court of appeals for the second circuit stated recently:

"We do not believe that searching an attorney's legitimate work product is necessary to the normal bargaining to which a prosecutor resorts in recommending immunity. In our adversary system, without regard to Fifth and Sixth Amendment constitutional considerations, which in the light of our decision we need not reach in this case, the prosecution is not entitled to be served on a silver platter. The duty of each man to give evidence in a criminal investigation is always limited by his personal privilege against self-incrimination. So long as he does not act simply to protect others and so long as he is free to make his own choice with independent legal advice, the Government has neither cause for complaint nor a proper claim of necessity to override the protection of a lawyer's work product." *In re Grand Jury Subpoena,* 599 F.2d 504, 513 (2nd Cir. 1979).

The dangers of using interview memoranda to refresh the recollection or challenge the credibility of grand jury witnesses, or as evidence of criminal acts, were asserted by the court in *In re: Grand Jury Investigation,* 599 F.2d 1224 (3rd Cir. 1979):

"Memoranda summarizing oral interviews present several unique and well-documented problems to the court which considers their discoverability. First, they may indirectly reveal the attorney's mental processes, his opinion work product. *See, e. g., Hickman v. Taylor, supra,* 329 U.S. at 513, 67 S.Ct. 385; *In re Grand Jury Investigation (Sturgis), supra,* at 949. Second, their reliability as accurate reflections of the witness's statements is a function of many factors, including the conditions of the interview, the contemporaneousness of the writing, and the editorial discretion of the attorney. *See, e. g., Hickman v. Taylor, supra,* 329 U.S. at 512–13, 67 S.Ct. 385. Third, discovery and use of such material creates a danger of converting the attorney from advocate to witness. *See, e. g., United States v. Nobles, supra,* 422 U.S. at 252–53, 95 S.Ct. 2160 (White, J., concurring); *Hickman v. Taylor, supra,* 329 U.S. at 513, 67 S.Ct. 385. Finally, the information contained in such memoranda generally is of limited utility, especially where the witness himself is readily available to the opposing party. *See, e. g., Hickman v. Taylor, supra,* at 513," 67 S.Ct. 385.

Thus, I do not find the government's reasons sufficient to justify discovery of Quarles & Brady's work-product in the form of interview memoranda. Accordingly, the government's subpoena as to those documents will be quashed.

## IV. ACCOUNTANT'S WORKPAPERS AND STATISTICAL COMPILATIONS

█ The government's subpoena also calls for the production of "all accountant's workpapers, all statistical compilations, statistical summaries, schedules, computations and workpapers." The work-product privi-

lege extends not only to documents prepared by counsel but also to those prepared by a client under the supervision of an attorney in the course of preparation for possible litigation. *See Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487, 492 (7th Cir. 1970), aff'd by equally divided Court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971); *In re Grand Jury Subpoena*, 599 F.2d 504, 513 (2d Cir. 1979).

■ One of Miller's attorneys from Quarles & Brady has averred that the accountant's worksheets and statistical compilations in the subpoenaed files were prepared under the direction and at the request of attorneys from Quarles & Brady. My perusal of the subpoenaed files supports this contention. The figures found on such sheets deal almost exclusively with events occurring in the years 1971–74. The most logical explanation for this fact is that the Quarles & Brady investigation dealt with "questionable payments" made during those years and the documents were prepared as part of that investigation. Therefore, the government's subpoena will be quashed insofar as it demands the accountant's workpapers and statistical compilations.

## V. MISCELLANEOUS DOCUMENTS

The subpoenaed files contain documents which do not fit exactly into any of the specifically enumerated categories of documents listed in the government's subpoena. I will briefly discuss my disposition of the instant motion with regard to such documents.

■ The subpoenaed file contains legal memoranda produced by Quarles & Brady, including summaries of state and federal laws potentially applicable to Miller and Philip Morris. Such memoranda are clearly work-product, and the government has not advanced any reason which would justify their release.

■ Also in the file is written correspondence between counsel and their clients. Discovery of such communications would be precluded by the attorney-client privilege.

■ The subpoenaed file also includes numerous drafts of the internal audit report produced by Quarles & Brady. Although the final draft of the report has been released to the government, I believe that prior drafts of the report are privileged as work-product.

■ The file also contains various tax documents, including form 1120 for the years 1973 and 1974, form 4564 information docket requests, and forms 4549 and 886–A income tax audit change reports. In an affidavit, one of Miller's attorneys claims that since "these documents were furnished at the attorneys' request to assist them in their work, reflect the attorneys' legal analysis, and also constitute communications between attorney and client" the work-product doctrine and attorney-client privilege are applicable. I disagree.

Neither the work-product doctrine nor the attorney-client privilege applies to the tax documents in question. None of these documents was prepared for the purpose of the Quarles & Brady investigation. Moreover, most if not all of these documents should be on file with the Internal Revenue Service. Therefore, Quarles & Brady will be required to produce these tax documents.

■ The subpoenaed file also contains various records and samples of records which would appear to have been kept by Miller during the regular course of business. These records include state tax copies of invoices, competitive allowance forms, warehouse allowance forms, promotional request forms, military allowance forms, accounts payable distribution sheets, request for check sheets, and Miller monthly allowance reports. As to such documents, the movants have stated in their reply brief:

"We agree with the government's position that commercial documents prepared in the ordinary course of business by employees of the company are not protected by the work-product rule. It is for that reason that all such documents sought by the government have either been heretofore produced to the grand jury, or are presently being assembled for production."

Accordingly, the motion to quash the subpoena will be denied as to those documents listed above which were prepared in the ordinary course of business. Quarles & Brady will be required to produce these documents from its own records or ensure that such records have been or are produced directly by Miller.

Finally, the subpoenaed files include a copy of a promissory note from the American Discount Corporation to Miller. I see no basis for withholding this note from the government, and thus the motion to quash will be denied as to this promissory note.

## VI. APPEARANCE BY ATTORNEYS

██ Insofar as the instant motion seeks to bar the government from calling attorneys from Quarles & Brady before the grand jury, it will be denied. My granting of the motion to quash the subpoena as to documents privileged under the attorney-client or work-product doctrines precludes the government from questioning Miller's attorneys regarding the communications and analysis contained in such documents. However, I am not in a position to say definitively that there are no areas of relevance to the grand jury as to which lawyers from Quarles & Brady might lawfully be questioned. Thus, I cannot absolutely bar the government from calling lawyers from Quarles & Brady as witnesses.

## VII. CONCLUSION

Therefore, IT IS ORDERED that the motion of Quarles & Brady, Philip Morris, Inc., and Miller Brewing Co. to quash the subpoena duces tecum issued on July 13, 1979, be and hereby is granted, except as to the following documents:

(1) Tax forms 1120, 4564, 4549–A, 4549–B, and 886–A;

(2) Documents prepared in the ordinary course of business, including state tax copies of invoices, competitive allowance forms, warehouse allowance forms, promotional request forms, military allowance forms, accounts payable distribution sheets, request for check sheets, and Miller monthly allowance reports;

(3) The promissory note from American Discount Corporation to Miller Brewing Co.

IT IS ALSO ORDERED that Quarles & Brady produce from its own files or arrange to produce from the files of Miller Brewing Co. or Philip Morris, Inc., copies of the aforementioned documents within ten days of the date of this order at a place and time designated by the United States attorney.

IT IS FURTHER ORDERED that the motion to quash the subpoena be and hereby is denied insofar as it seeks to bar absolutely the government from calling lawyers from Quarles & Brady as witnesses before the grand jury.