In re GRAND JURY SUBPOENAS
DATED DECEMBER 18, 1981
AND JANUARY 4, 1982.

No. 82 Civ. 0234, 0286.

United States District Court,
E.D. New York.

Aug. 20, 1982.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

### SUMMARY

Two motions have been made to quash certain subpoenas. On June 16, 1982, I issued a preliminary order to expedite the grand jury proceeding to which the motions apply. The order contained only my findings and indicated that a final memorandum and order, including an extensive discussion of the law and how it relates to the subpoenaed documents, would follow. The following constitutes my final memorandum and order.

These are my findings:

A. The following document is protected, and therefore not discoverable:

Walco Document 3

3. The following documents are discoverable:

#### ATTORNEY DOCUMENTS

1. Documents 1 and 2. Discoverable because the Government has established a prima facie case that the documents were created in furtherance of fraud.

2. Documents 3 through 6. Discoverable for alternative reasons. First, they were prepared in furtherance of fraud. Second, material otherwise privileged was waived by disclosing it to an unprotected party.

3. Documents 7 and 8. Discoverable for alternative reasons. First, the drafts were prepared in furtherance of fraud. Second, the letter requesting the House Committee's advisory opinion disclosed the information contained in the drafts, thereby waiving the attorney-client privilege in connection with this material.

4. Document 9. To the extent that this request contains confidential material, protection which otherwise would have been afforded has been waived by disclosing such material to an unprotected third party.

5. Document 10. Its protection was relinquished by disclosing it to a person who had no need to learn of the material disclosed therein.

6. Document 11. This document is a cover letter for seven writings. The document itself is not privileged because it contains no confidential information. Three of the attached writings were prepared in furtherance of fraud and, therefore, are not privileged (Walco Document 5, *infra*, the Pension Agreement, and the House Ethics Committee Advisory Opinion). Another three writings contain only business advice (Attorney Document 12, *infra*, Richmond's resignation letter and certain Corporate Minutes). The last writing, Attorney Document 10, is discoverable for the reason already noted in paragraph 5, *supra*.

7. Document 12. Since it memorializes business, rather than legal advice, it is not a privileged communication.

8. Documents 13, 14 and 15. Such matters are outside the protections of the attorney-client privilege.

9. Document 16. Since this information is available for public inspection, it is not confidential and thus discoverable.

#### WALCO DOCUMENTS

1. Document 1. Discoverable because such material was disclosed to an individual who had no need to be informed of its contents.

2. Document 2. The Government has established a prima facie case that this document was prepared in furtherance of fraud.

3. Document 4. Information concerning these subjects are not protected by the attorney-client privilege.

4. Document 5. Discoverable because it was prepared in connection with and in furtherance of fraud.

5. Documents 6, 7 and 8. Walco has failed to satisfy its burden that the matters discussed during these meetings and the advice solicited with respect to the draft minutes were primarily legal in nature.

### DISCUSSION

Three subpoenas are involved in these motions. The first two subpoenas were

served on a law firm and one of its senior partners (whose identities are being kept anonymous) on December 18, 1981. During the time covered by the subpoena, the law firm represented Walco National Corporation ("Walco"). The firm asserts that at the same time it represented Frederick Richmond, a member of the United States House of Representatives, who until December 31, 1978 also served as Chairman of the Board of Walco.

Both subpoenas called for:

all notes, memoranda, letters, diaries, records of telephone conversations and files concerning the preparation of the pension proposal on behalf of Walco National Corporation and Frederick W. Richmond during the period between November 1, 1978 and June, 1979.

The law firm asserts that this first pair of subpoenas should be quashed or modified because they call for sixteen documents that are protected by the attorney-client privilege.[1]

A third subpoena was served on Walco on January 4, 1982. This subpoena calls for the production of

all books, records, documents, correspondence, ledgers, checks, check requests, agreements or writings of any kind relating to any pension plan(s) for any past or present employees, executive officers or directors of Walco National Corporation.

Walco has moved to quash this subpoena on the ground that it calls for eight documents that are protected by the attorney-client and work product privileges.

I. *Richmond's Attorney-Client Relationship.*

 Whoever claims the attorney-client privilege bears the burden of establishing it. *In re Horowitz,* 482 F.2d 72, 82 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct.

64, 38 L.Ed.2d 86 (1973); 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961). To create an attorney-client privilege, the following facts must be established:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a· member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer, (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of others (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services . . . and not (d) for the purpose of committing a crime or tort; and (4) the privilege has . . . not been waived.

*United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358 (D.Mass.1950).

 The attorney herein subpoenaed states that he represented Frederick W. Richmond at various times between November 1, 1973 and June, 1979. (Attorney affidavit, ¶ 2) More specifically, he states that to ensure Richmond's compliance with United States House of Representatives Rule XLVII, a rule which places a ceiling on the outside income of members of Congress, he submitted to the House Select Committee on Ethics a proposed pension agreement between Walco and Richmond. I find that the attorney did not represent Richmond for purposes of the attorney-client privilege.

In a recent deposition taken of the attorney in *General Steel Industries, Inc. v. Walco National Corporation and Frederick W. Richmond,* Dkt. No. 81–1410–c (E.D.Mo. 1981), the attorney was shown a copy of a letter embodying the Walco-Richmond pension agreement. The following exchange ensued:

Q. Was this document negotiated with Mr. Richmond?

---

1. On February 25, 1982, this Court permitted Frederick Richmond to intervene and he submitted a memorandum supporting his attorney's motion to quash the subpoenas. Richmond asserts that this attorney represented him individually, as well as Walco. He then contends that the disputed documents are protected by both the attorney-client privilege and the work product doctrine. Richmond also argues that even if the attorney did not represent him, his statements to the lawyer would be protected by the attorney-client privilege existing between Walco and the attorney.

A. I don't know.

Q. Did you represent Mr. Richmond in connection with this agreement?

A. No. I did not. I represented Walco. (Attorney Deposition at 16.) It seems apparent, therefore, that despite the statements now made in the attorney's affidavit, the attorney did not represent Mr. Richmond during the negotiations of this agreement. This conclusion is confirmed by the affidavit submitted by the attorney's present counsel. (Reply Affidavit ¶ 7.)

Even if the attorney did not represent Richmond during the negotiation of the pension agreement, he asserts that he represented Richmond, at least when he presented the draft of the pension agreement to the House Ethics Committee. The cover letter sent to the Ethics Committee stated, in essence, that the attorney was seeking an advisory opinion from the Committee on behalf of "his client," Mr. Richmond.

A review of the attorney's deposition testimony in the *General Steel* matter, however, again compels a contrary conclusion. After the attorney was shown the letter he had sent to the Ethics Committee, the following exchange occurred:

Q. Now ... would you look at your letter again, please ... the first sentence of which says, "pursuant to the instructions of my client the Honorable Frederick W. Richmond, I am submitting simultaneously herewith a proposed agreement" and it goes on. Were you representing Mr. Richmond in connection with this agreement?

A. Well, I think insofar as the pursuit of this legal opinion on behalf of Walco, it was necessary for me to act on behalf of Mr. Richmond because they would not deal with Walco directly, they would only deal with one of their members. And that was the reason for the letter .... So that in this regard here, the only way that I could pursue my obligations to Walco and the pension committee was to represent Mr. Richmond as a member

of Congress with one of his own committees.

Q. So with regard to this transaction, the drafting and approval of the pension agreement, you represented both Mr. Richmond and the company at various points; is that correct?

A. ... The main objective I had was to pursue this need of Walco to get an opinion from the Congressional Committee. In order to do that, I had to represent Richmond personally because they would not deal with a company, they had to deal with a member.

\* \* \* \* \* \*

Further evidence that the attorney represented Walco rather than Richmond may be gleaned from the Richmond deposition in a recent civil action challenging the validity of the pension agreement for lack of consideration. Richmond was first asked whether the attorney "represented [him] and [his] interests vis-a-vis the Pension Committee?" Richmond responded, "Your Honor, I'm afraid you'll have to ask [the attorney]. I really don't know." (Richmond Deposition at 64.) Subsequently, Richmond was shown a copy of the letter the attorney sent to the Ethics Committee. After indicating that he did not recall ever reading it (Richmond Deposition at 65–66), there is the following colloquy:

Q. Is it true, sir, that you gave instructions to [the attorney] to send that contract, whatever it was, to the Ethics Committee?

A. No.

Q. It's not true?

A. I don't remember.

Q. Did you know that [the attorney] was sending some kind of contract to the Ethics Committee putting aside right what exactly that contract was?

A. I knew that [the attorney] was charged with making certain that anything we did was acceptable to the members of the Committee on

Standards. That is the Ethics Committee.

Q. Didn't it also have to be acceptable to you?

A. As far as I was concerned, anything that the Walco Pension Committee decided was a right and reasonable pension for me was perfectly acceptable to me. I had no intention of negotiating with the members of the Walco Pension Committee.

The evidence therefore is that Walco, not Richmond, retained the attorney for legal advice; that the attorney represented Walco; and that whatever representation the attorney gave to Richmond was purely as an accommodation to the House Committee's policy of issuing advisory opinions only when requested by members of the House of Representatives. The attorney and Richmond, therefore, have failed to establish the threshold requirement for the existence of the attorney-client relationship, i.e., that a potential client sought legal assistance from the attorney.

## II. *Walco's Attorney-Client Relationship.*

Even though the attorney did not represent Richmond, communications between Richmond and the attorney, as well as between Richmond and certain Walco executives, might still be privileged if Richmond could be drawn within the net of Walco's attorney-client relationship. This might be done if, for example, Richmond were considered a representative of Walco, the client, for the purpose of communicating with the attorney. I conclude otherwise, however.

### 1. *Richmond was not a representative of Walco.*

In *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Supreme Court addressed the nettlesome question as to which corporate officers and employees are authorized to speak for a corporation in the attorney-client context. The Court rejected the narrow control group test in favor of a broader, more flexible test that allows corporate counsel greater access to information. *Upjohn Co. v. United States*, 449 U.S. at 387–88, 101 S.Ct. at 681–82.

The control group test, first articulated in *City of Philadelphia v. Westinghouse Electric Corp.*, 210 F.Supp. 483, 485 (E.D.Pa. 1962), would have protected communications to a corporate attorney only from those in a position to control or substantially contribute to a corporate decision based on the attorney's advice. Under *Upjohn*, however, statements by an employee which provide information helpful to the attorney's representation of the corporate client may be protected irrespective of the employee's position or authority to make corporate decisions. Thus, Richmond's statements to the attorney (and the attorney's responses thereto) might be privileged if they supplied the attorney with helpful (and confidential) information concerning the pension agreement, information that aided the attorney in his representation of Walco.

A painstaking review of the record, including the twenty-four documents withheld by Walco and the attorney, reveals only one request to Richmond from the attorney for information germane to the pension agreement.[2] The request (for two documents) concerns the nature of Richmond's future relationship with Walco.

This result comes as no surprise, since, as Richmond's testimony in the pension litigation indicates, he deliberately divorced himself from Walco Management with respect to the pension agreement. When he was asked, "Did you have any input on the terms of the [pension] agreement?", Richmond responded, "Absolutely none." (Richmond Deposition at 62.) Not only did he remove himself from discussing, negotiating and voting on the agreement, he also stated that he had no discussions with anybody concerning the specific terms of the agreement, including members of the pen-

---

2. See Attorney Documents 1 and 2.

sion committee. (Richmond Deposition at 83.) In essence, as summed up by Mr. Richmond himself, "I left the matter entirely in the hands of the members of the Pension Committee." (Richmond Deposition at 83.)

In light of these statements, it is certainly incongruous and probably disingenuous for the attorney and Walco to assert now that Richmond was a representative of Walco for purposes of the attorney-client privilege. Furthermore, as will be discussed below, since Richmond abjured all responsibility for the pension, and thus had no need to keep abreast of developments regarding the formulation of the pension, disclosure to Richmond of privileged communications by the attorney or other Walco executives also caused Walco to forfeit the attorney-client privilege it would otherwise have enjoyed.[3] *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *United States v. United Shoe Manuf. Corp.,* 89 F.Supp. at 358; 8 Wigmore, Evidence § 2291.

## 2. *The Fraud Exception.*

Before turning to the specific documents, one overriding issue should be addressed. The Government asserts that Walco sought the attorney's legal assistance, in part, to defraud the House Ethics Committee. This fraud was perpetrated, according to the Government, by misrepresenting the nature of the services Richmond would perform for Walco after his "retirement".

It is fundamental that communications between an attorney and client lose their protection when the purpose of the communication is to further a future wrongdoing. *Clark v. United States,* 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *Matter of Doe,* 551 F.2d 899 (2d Cir.1977); 8 Wigmore, Evidence § 2298. Thus, if Walco sought the attorney's advice to defraud the House Ethics Committee with respect to the actual consideration for the pension agreement, all communications between the attorney and Walco that were made in furtherance of the fraud would be unprivileged.

To invoke the fraud exception to the attorney-client privilege, the party seeking disclosure must make a "prima facie" case that the client sought the attorney's advice to further some future wrongdoing. *Clark v. United States,* 289 U.S. at 15, 53 S.Ct. at 469; *United States v. Bob,* 106 F.2d 37, 39–40 (2d Cir.1939). The term "prima facie" case is, of course, a chameleon phrase that takes the coloration of its context. In the context of the attorney-client privilege, it means that the party seeking to pierce the privilege need only produce enough evidence to subject the attorney and the client to the "risk of non-persuasion," if the evidence is left unrebutted. *Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1120 (4th Cir.1976). *See, In re Berkley & Co.,* 629 F.2d 548, 553 (8th Cir.1980); *Int'l Tel. and Tel. Corp. v. United Tel. Co. of Fla.,* 60 F.R.D. 177, 181 (M.D.Fla.1973). In the interest of disclosure, the privilege should fall if there is a sufficient basis for the charge

---

**3.** Some of the documents were sent to Richmond by the attorney. This results in a waiver of the attorney-client privilege for either of two reasons. Some courts and commentators are easily disposed to find that an attorney has the implied authority to make disclosures that waive the privilege on the client's behalf. *See, e.g., Velsicol Chemical Corp. v. Parsons,* 561 F.2d 671, 675 (7th Cir.1977); *United States v. Aronoff,* 466 F.Supp. 855, 862 N. 7 (S.D.N.Y. 1979); 8 Wigmore, Evidence § 2325 (McNaughton rev. 1961). They are particularly willing to find this authority when the attorney is house counsel, for as such, the attorney is an agent of the client corporation with the authority to make disclosures. *See Velsicol Chemical*

*Corp. v. Parsons,* 561 F.2d at 675; Comment, *The Application in the Federal Courts of the Attorney-Client Privilege to the Corporation,* 39 Fordham Law Review 281, 295 (1970).

Other courts have held that the attorney can waive the privilege only with the client's consent. *See, e.g., Republic Gear Co. v. Borg-Warner Corp.,* 381 F.2d 551 (2d Cir.1967). The consent, of course, need not be express. Here, Walco's consent can be inferred from the fact that a Walco officer made similar disclosures to Richmond. These disclosures evidence a corporate decision to keep Richmond abreast of various aspects of the pension agreement, a decision that the attorney was merely carrying out.

to call upon the attorney for an answer. See Model Code of Evidence, Comment to Rule 212 (1942).

House Rule 47 generally prohibits a member of the House of Representatives from earning in excess of fifteen (15) percent of his yearly aggregate salary from outside sources. The Select Committee on Ethics has stated that the rule will be strictly interpreted:

> The limitations imposed by Rule XLVII may not be avoided by the characterization or disposition of any payment for services rendered. In all cases the real facts will control.... *[I]f ... the true consideration for the payment is services rendered by the Member, the amount will be deemed outside earned income of the Member. [Thus], the label or characterization placed on the transaction, arrangement or payment by the parties may be disregarded for the purposes of the Rule.* (emphasis added). (Select Committee on Ethics, United States House of Representatives, Advisory Opinion # 13, General Interpretation of House Rule XLVII at 3.)

I have reviewed both the pension agreement between Walco and Richmond and the December 8, 1978 letter from the attorney to the House Ethics Committee seeking an advisory opinion as to whether the agreement comports with Rule 47. These documents expressly state that the consideration for the agreement is limited to past consideration. Referring to Richmond, the agreement itself states "You are presently Chairman of the Board of and an Officer of Walco, and have heretofore rendered valuable services to Walco and its subsidiaries and its divisions. In consideration of such past services, Walco agrees to pay you a pension upon termination of your employment ...." In requesting the House Ethics Committee's advisory opinion, the attorney, in addition to enclosing a copy of the agreement, informed the Committee that "Mr. Richmond will resign as Chairman of the Board and as an Officer and employee from all Walco companies, thereby severing his day to day services to the Company.

[Additionally], he intends to continue as a member of the Board of Directors so that he can keep track of his substantial equity interest in the company."

Although the material submitted to the House Ethics Committee created the impression that Richmond was retiring from active service to Walco and that Walco was rewarding Richmond solely for his past services to the Company, careful scrutiny of the statements made by members of the Pension Committee provides contrary evidence. For example, the deposition testimony of an officer of Walco and a member of the Pension Committee, indicates that one of Walco's objectives in entering into the pension agreement with Richmond was to insure that Richmond would continue to work for Walco in the future. When asked about this objective, the following colloquy ensued:

Q. Were you involved in the arrangement for Mr. Richmond's pension agreement toward the end of 1978?

A. Yes.

Q. And at that time were you desirous on behalf of Walco of maintaining the same contributions that Mr. Richmond had been making to the company in terms of services for the future?

A. Yes.

Q. And was that one of your goals in establishing the pension agreement?

A. Yes, it was.

(Officer's Deposition at 45.)

Statements made by another individual who was a Director of Walco and a member of the Pension Committee, also indicate that the Pension Committee believed that Richmond would provide continued services to Walco after his "retirement" in exchange for the pension. During the director's deposition testimony the following conversation occurred:

Q. Did you discuss amongst your committee, the desire to maintain Mr. Richmond's participation in Walco's investment activities?

A. We discussed, in the committee, quite a number of—as I recall—points which we wished to incorporate in the pension agreement with Richmond, one of them being his continued activity on behalf of Walco's investment program.

Q. And you were desirous of retaining that activity?

A. That is correct.

Q. And the other members of the pension committee also shared that goal?

A. Yes.

(Director's Deposition at 28.)

The statements of a second Walco Director on the consideration for the pension agreement compel the conclusion that the pension committee members wanted Richmond to continue to provide advice and services to Walco after his "retirement". Discussing the restrictive covenants incorporated into the agreement, this Director indicated that these covenants were designed to insure that Richmond would continue to provide services to Walco and to no other company after his retirement. (Second Director's Deposition at 16.) At a later point in the deposition, the Director was asked if he agreed with a statement attributed to someone else that the directors of Walco were using the pension to get Richmond to perform services for the company for less than the salary he had been receiving.

Specifically, he was asked whether he agreed with the following characterization:

"Now, what [was] said, and I read it again, what every director saw here was that they would have the benefit of this man's talent for $100,000 instead of paying him $187,000."

The Director responded, "I think, there's a lot to that, yes." (Second Director's Deposition at 21–22.) [4]

■ It is evident from a review of the record that Richmond did in fact continue to actively work for Walco subsequent to his "retirement". This work included having complete responsibility over Walco's acquisition of a financial interest in Standard Alliance Industries (Richmond Deposition at 88), and providing significant contributions to Walco in its attempt to take over General Steel Industries, including personally negotiating with Pacific Holding Company which held twenty-five percent of General Steel's stock.[5] It taxes the most generous

---

4. I note that Federal District Court Judge H. Kenneth Wangelin of the Eastern District of Missouri found in *General Steel Industries v. Walco,* Dkt. No. 81–1410–c (E.D.Mo.1981), that the pension agreement was a sham. After reviewing deposition testimony of Walco employees as well as other relevant documents he concluded that Richmond's termination of employment was feigned. He stated that "in reality, the purpose of the pension agreement was to retain and compensate Richmond for services to be provided to Walco." *General Steel* at 6–7.

Although these findings were ultimately vacated on December 16, 1981 pursuant to a stipulation of the parties, nothing in the order vacating the findings raises questions concerning their validity. The case of *Pfizer, Inc. v. Lord,* 456 F.2d 545 (2d Cir.1972), although emphasized by Richmond and the attorney for the proposition that I may not consider Judge Wangelin's findings, is inapposite. In that case, the findings of the FTC could not later be relied upon to show a prima facie case of fraud because one of the commissioners who took part in the FTC decision should have been disqualified. Thus, the findings were vacated because they contained an internal flaw that amounted to a violation of due process. No such flaw exists with respect to Judge Wangelin's findings. As preliminary findings they are, at least, worthy of consideration.

5. *See also* Judge Wangelin's Findings of Fact and Conclusions of Law at 4–5. I have not overlooked Judge Stecher's opinion in *Lewis v. Richmond,* Dkt. No. 19386/79 (N.Y.Sup.Ct., N.Y.Co. Part 13, 1982). There it was held, in a stockholder's derivative suit, that the pension agreement was invalid because it was supported only by past consideration. Judge Stecher found that any services performed by Richmond subsequent to his retirement were strictly voluntary.

A careful review of Judge Stecher's opinion, however, reveals that it did not reach the issue of whether the agreement violated House Rule 47. As set forth in the opinion, "It is to be borne in mind that this court is not concerned with the enforcement of Rule XLVII of the House of Representatives of the United States. Its enforcement is exclusively within the province of that legislative body and the violation of its rule, if any, creates no [stockholder's derivative] cause of action." *Lewis v. Richmond,* at

credulity to suggest that these activities were undertaken by Richmond solely to "keep track of his substantial equity interest" in Walco, as suggested in the attorney's letter to the House Ethics Committee.

As stated previously, the pension agreement does not, on its face, obligate Richmond to perform services for Walco after his "retirement". The Government, however, has established not only that future services were performed, but that members of the Walco Pension Committee entered into the pension agreement to secure, in part, Richmond's continued performance of those services. The Government has established a prima facie case that Walco sought the attorney's advice to further a future wrongdoing. Accordingly, all documents containing communications between Walco executives and the attorney that further Walco's venture to defraud the House Ethics Committee fall outside the pale of the attorney-client privilege.

III. *Rulings on Specific Documents.*

1. *One Document is Protected.*

Only Walco Document 3 merits protection. Walco asserts that this document is covered by the work product immunity, and I agree.

■ Under Rule 26(b)(3) of the Federal Rules of Civil Procedure ("F.R.C.P."), three conditions must be met to earn work product protection. The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative. *See Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

■ Once these conditions are satisfied, the party seeking discovery must establish a substantial need for the material and a practical inability to secure the substantial equivalent thereof by alternative means. F.R.C.P. 26(b)(3). If the material reflects the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party, then a showing beyond the substantial need and undue hardship standard must also be made. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *In re Murphy,* 560 F.2d 326, 335–337 (8th Cir.1977); F.R.C.P. 26(b)(3).

■ I find that Walco has established the three prerequisites for the invocation of the work product doctrine. Moreover, the Government has not demonstrated that it has a substantial need for the material and that it is unable to secure its substantial equivalent without undue hardship.

■ The protection accorded this document was not waived by disclosing it to an unprotected third party. Nor was it vitiated by fraud. Although the thoughts and impressions of a Walco officer were relayed to Mr. Richmond, this disclosure, unlike disclosure of a document protected by the attorney-client privilege, as discussed below, does not necessarily waive the work product immunity.[6] Disclosure of work product to a third party does not waive its protection unless it substantially increases the opportunity for potential adversaries to obtain the information. *Transamerica Computer Company, Inc. v. IBM,* 573 F.2d 646, 647 N. 1 (9th Cir.1978); *GAF v. Eastman Kodak Co.,* 85 F.R.D. 46, 51–52 (S.D.N.Y.1979); 8 Wright and Miller, Federal Practice and Procedure, § 2024 (1979). Disclosure to Richmond did not increase the Government's opportunity to obtain the information contained in Walco Document 3.

9. Even assuming that *Lewis v. Richmond* had some bearing on whether House Rule 47 was violated, the Government need only establish a prima facie case, rather than prove the existence of fraud, in order to destroy the attorney-client privilege.

**6.** The waiver rule with respect to documents protected by the work product doctrine is different from that with regard to the attorney-client privilege because the former is concerned only with confidentiality vis-a-vis opposing counsel, whereas the latter rule is concerned with confidentiality vis-a-vis anyone other than the client. 8 Wright and Miller, Federal Practice and Procedure § 2024.

Some cases have held that fraud may, in limited situations, vitiate the protection provided by the work product immunity. *See, e.g., In re Doe,* 662 F.2d 1073 (4th Cir.1981); *In re Grand Jury Proceedings,* 604 F.2d 798 (3rd Cir.1979); *In re Murphy,* 560 F.2d 326 (8th Cir.1977). A review of these cases, however, reveals that the Government cannot satisfy the stringent criteria necessary to obtain the work product material contained in Walco Document 3. Since the government cannot establish either that it has a substantial need for the document and that it is unable to obtain it through other means, or that the document bears a close relationship to the fraud, the document remains protected. *In re Grand Jury Proceedings,* 604 F.2d 798 (3rd Cir. 1979); *In re Murphy,* 560 F.2d 326 (8th Cir.1977).

### 2. The Communications in Furtherance of Fraud.

#### A. Attorney Documents.

■ *Documents 1 and 2.* Attorney Documents 1 and 2 are drafts of a letter from the attorney to Richmond. Although these drafts contain some handwritten notes by the attorney, the notes are entitled to protection only if they incorporate confidential information supplied by the client to the attorney while he was acting in a legal capacity. *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 359 (D.Mass.1950). Analyzing the contents of these documents, it is apparent that only one paragraph contained therein falls into this category.

The last two sentences on page 1 and the first two sentences on page 2 are requests for information from Richmond concerning the nature of his future relationship with Walco. Although this information would have aided the attorney in his representation of Walco, and thus would normally have been privileged, the Government has established a prima facie case that Richmond's future relationship with Walco was misrepresented to the House Ethics Committee; and thus the document was prepared in furtherance of a fraud.

■ *Documents 3 through 6.* These documents are drafts of a letter from the attorney (on behalf of Walco) to Richmond outlining the pension agreement. Insofar as the Government has established a prima facie case that the pension agreement misrepresented the real arrangement between Walco and Richmond, these drafts are in furtherance of a fraud.

Assuming, arguendo, that the government has not established a prima facie case of fraud, these drafts are discoverable on alternate grounds. The drafts reflect primarily business considerations rather than legal advice. Notwithstanding that both business and legal considerations are interwoven throughout the drafts, these considerations must be isolated and treated differently "in the interest of preserving the integrity of the privilege itself." *Hercules v. Exxon Corp.,* 434 F.Supp. 136, 147 (D.Del. 1977). *Accord, SCM v. Xerox Corp.,* 70 F.R.D. 508, 518 (D.Conn.1976). As then District Court Judge Newman noted in *SCM v. Xerox,* "[w]hen the ultimate corporate decision is based on both a business policy and a legal evaluation, the business aspects of the decision are not protected because legal considerations are also involved." *SCM v. Xerox,* 70 F.R.D. at 518.

■ The only material in these drafts which arguably reflects legal advice concerns the consideration for the pension. The confidentiality otherwise applicable to this advice, however, has been lost by disclosing this advice to Mr. Richmond. Although communication from an attorney to a corporate employee with respect to legal advice given the corporate client may be privileged, the privilege attaches only if the communication is disseminated to an employee who needs to know the material because he has a direct responsibility over the subject matter. *United States v. Am. Tel. & Tel. Co.,* 86 F.R.D. 603, 623 (D.D.C. 1980); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 518 (D.Conn.), *appeal dismissed,* 534 F.2d 1031, 1032 (2d Cir.1976); *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.,* 62 F.R.D. 454, 456–57 (N.D.Ill.1974), *aff'd,* 534

F.2d 330 (7th Cir.1976). In light of Richmond's own statements concerning his deliberate withdrawal from any responsibility over the pension agreement, it would be anomalous to hold now that he was within the category of individuals who needed to be kept abreast of developments regarding the pension.

■ *Documents 7 and 8.* These documents are drafts of a letter from the attorney to Congressman Preyer (the Chairperson of the Select Committee on Ethics of the House of Representatives) requesting an advisory opinion on whether the pension agreement complied with House Rule 47. The Government has made a prima facie showing that the letter sent to the Committee was designed to create a fraudulent impression concerning Richmond's future commitment to Walco, and therefore there is no privilege.

As with the previous documents, even if there were no such showing, the documents would still be discoverable. The attorney asserts that these drafts are protected because they incorporate information supplied by the client. These conversations and the material memorialized in the attorney's notes and drafts, however, could be privileged only if "it was understood that the information communicated in the conversation was [not] to be conveyed to others." *United States v. Tellier,* 255 F.2d 441, 447 (2d Cir.1958). Such is clearly not the case.

That the request for the advisory opinion was made privately and that the rules of the House Ethics Committee[7] generally maintain the confidentiality of such requests do not change this determination. *Cf., Byrnes v. IDS Reality Trust,* 85 F.R.D. 679 (S.D.N.Y.1980); *In re Grand Jury Subpoena Dated July 13, 1979,* 478 F.Supp. 368 (E.D.Wisc.1979). It is true that some courts have refused to find a waiver of the attorney-client privilege when voluntary disclosure is made to a governmental body. The fear is that a finding of waiver under such circumstances would discourage cooperation with the investigative authorities. *See,*

*e.g., Diversified Industries Inc. v. Meredith,* 572 F.2d 596 (8th Cir.1977). Whatever the merit of that argument, the Second Circuit will not preserve a privilege in the face of a voluntary disclosure unless, at the very least, the client takes some "affirmative action to preserve confidentiality." *In re Horowitz,* 482 F.2d 72, 82 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *Teachers Ins., Etc. v. Shamrock Broadcasting Co.,* 521 F.Supp. 638, 645 (S.D. N.Y.1981); 8 Wigmore, Evidence § 2326. Even then there is grave doubt that the client may choose selectively the persons to whom he will divulge his confidences. *In Re John Doe Corp.,* 675 F.2d 482 (2d Cir. 1982). In any event, a review of the letter sent to Congressman Preyer discloses no attempt whatsoever to maintain the confidentiality of the contents of the communication.

### B. *Walco Documents.*

■ *Documents 2 and 5* reflect legal advice given by the law firm and solicited by Walco on certain aspects of the pension agreement. Document 2 contains proposed questions and answers concerning the reasons for the adoption of the pension agreement. Document 5 requests advice concerning a limited aspect of the pension agreement "under the agreement reached with the Ethics Committee." Although both documents would otherwise have been privileged, the protection has been vitiated by the Government's prima facie showing of fraud.

### 3. *The Remaining Unprivileged Documents.*

The remaining thirteen (13) documents withheld by the attorney and Walco are all discoverable. One of the communications was voluntarily disclosed to the House Ethics Committee without any reservation of confidentiality; three were disseminated to an individual who had no responsibility over the subject matter discussed in the docu-

---

**7.** *See* Rules of Procedure, Committee on Standards of Official Conduct, United States House of Representatives, Rule X, Clause 4(e)(1)(D) and 4(2)(F).

ments and thus had no need to be informed of the material; four reflected business information and advice; and five discussed non-confidential matters.

### A. The Disclosed Documents.

■ *Attorney Document 9* is the attorney's request to outside counsel for an independent legal opinion as to whether the pension agreement constitutes a legal and binding agreement. Only one paragraph transmits information that might arguably be privileged; but this information (that other Walco executives entered into similar pension agreements) had previously been disclosed to the House Ethics Committee. As already noted, voluntary disclosure to this Committee without, at least, an express reservation of the attorney-client privilege relinquished any protection that might otherwise have been provided by the privilege. *In re Horowitz,* 482 F.2d 72, 82 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *Teachers Ins., Etc. v. Shamrock Broadcasting Co.,* 521 F.Supp. 638, 645 (S.D.N.Y.1981).

■ *Attorney Document 10* and *Walco Document 1* are copies of the opinion solicited from an outside law firm by the attorney regarding the enforcibility of the Walco-Richmond pension agreement. Although it might be a classic illustration of a privileged document, the privilege was waived by disclosing the opinion to Richmond. As outlined above, Richmond completely divorced himself from any participation in the decision-making process concerning the pension. Since he had no corporate duties to perform with respect to the pension, he had no legal cognizable need to know outside counsel's opinion concerning the agreement's enforcibility. Despite his practical interest in the pension, dissemination to Richmond destroyed the confidentiality of the communication. *See Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 610–11 (8th Cir.1977); *United States v. Am. Tel. &*

*Tel. Co.,* 86 F.R.D. 603, 623 n. 3 (D.D.C. 1980); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 518 (D.Conn.) *appeal dismissed,* 534 F.2d 1031, 1032 (2d Cir.1976); *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.,* 62 F.R.D. 454, 456–57 (N.D.Ill.1974), *aff'd* 534 F.2d 330 (7th Cir.1976).

■ *Attorney Document 11* is a cover letter, dated December 29, 1978, which lists seven writings enclosed for Richmond's "perusal". It is clear from both the discussion above and the face of the letter itself that Document 11 and the enclosed writings were sent to Richmond only for his personal enlightenment and not to solicit information that would aid the attorney in representing Walco's legal interests. Document 11 and the following seven enclosed writings are therefore discoverable: [8]

1. Resignation of Frederick W. Richmond as Chairman of the Board of Walco National Corporation.

2. Agreement between Walco National Corporation and Frederick W. Richmond, setting forth the pension arrangement between the parties.

3. Opinion of House Ethics Committee re compliance with House rule No. 47.

4. Opinion of the outside law firm regarding the legality of the aforesaid agreement. (Attorney Document 10, Walco Document 1).

5. Minutes of the Pension Committee of the Board of Directors of Walco National Corporation approving the aforesaid Pension Agreement. (Walco Document 6).

6. Proposed resolution to be submitted to the Board of Directors of Walco National Corporation at its next regular meeting on January 26, 1979.

7. Memorandum re insurance policies on the life of Frederick W. Richmond now owned by Walco National Corporation and which Mr. Richmond has an option to purchase on or before

---

**8.** Enclosed writings 2, 3 and 5 are discoverable for the alternative reason that the Government has made a prima facie showing that they were created in furtherance of fraud. Enclosed writings 1, 6 and 7 are discoverable for the alternative reason that they reflect business rather than legal advice.

June 30, 1979. (Attorney Document 12).

## B. Documents Reflecting Business Rather than Legal Advice.

 *Attorney Document 12* concerns four insurance policies in Richmond's name owned by Walco. The document outlines Richmond's business options with respect to purchasing these policies. Insofar as this document memorializes business, rather than legal, considerations, it is not a privileged document. *United States v. Loften,* 518 F.Supp. 839, 846–47 (S.D.N.Y.1981); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 517–18 (D.Conn.), *appeal dismissed,* 534 F.2d 1031 (2d Cir.1976); *Burlington Indus. v. Exxon Corp.,* 65 F.R.D. 26, 37–40 (D.Md. 1974); *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 359 (D.Mass. 1950).

*Walco Documents 6, 7 and 8* are drafts of minutes of Walco's Pension Committee meetings as well as correspondence between Walco and its attorneys regarding these drafts. A careful reading of the draft minutes reveals that the information discussed at these meetings was limited to business and investment statistics with respect to Walco's various pension funds. Additionally, Walco has failed to demonstrate that the advice solicited with respect to the draft minutes was primarily legal in nature.[9] *Barr Marine Products Co. v. Borg-Warner,* 84 F.R.D. 631, 636–38 (E.D.Pa. 1979). *Burlington Indus. v. Exxon Corp.,* 65 F.R.D. 26, 37–40 (D.Md.1974).

## C. Non-Confidential Material.

*Attorney Document 16* is not confidential since it is a copy of a draft of Mr. Richmond's financial disclosure statement that he must submit under the Ethics in Government Act of 1978, 2 U.S.C. §§ 701–709. Since section 704 indicates that the information is available for public inspection, the communication is not privileged. *United States v. Tellier,* 255 F.2d 441, 447 (2d Cir.1958).

The last documents, *Attorney Documents 13, 14 and 15* and *Walco Document 4* (which contains copies of the same documents) concern the general nature of services performed by outside counsel for the attorney as well as the fee charged for those services. These matters, however, have consistently been held to lie outside the protections of the attorney-client privilege. *Colton v. United States,* 306 F.2d 633, 636 (2d Cir.1962); *United States v. Pape,* 144 F.2d 778, 782 (2d Cir.1944); *Application of Doe,* 464 F.Supp. 757, 758 (S.D.N.Y.1979).

## CONCLUSION

Only one document, Walco Document 3, merits protection. Accordingly, all of the remaining 23 documents are to be turned over to the Government forthwith.

SO ORDERED.

---

9. Even assuming Walco Document 6 contains some material which reflects legal advice, it is nonetheless discoverable because a copy of these minutes was given to Richmond for his own personal enlightenment.